United States Court of Appeals
Fifth Circuit

**F I L E D**

**August 28, 2007**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

No. 05-20714

CARL R. PRUETT; SCOTT MARTIN,

Plaintiffs-Appellees-Cross-Appellants,

versus

HARRIS COUNTY BAIL BOND BOARD; HARRIS COUNTY,

Defendants-Appellants-Cross-Appellees.

--------------------
Appeal from the United States District Court
for the Southern District of Texas
--------------------

ON PETITION FOR REHEARING

Before HIGGINBOTHAM, WIENER, and CLEMENT, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

In response to the Petition for Rehearing filed by the defendants, we withdraw the prior panel opinion in its entirety and substitute the following.

Two bail bondsmen challenged a Texas statute restricting solicitation of potential customers as a denial of their First Amendment rights. The district court agreed. Concluding that all but one of the restrictions violates the bondsmen's right to commercial speech, we affirm, reverse, and remand, all in part.

I

Bail bondsmen Carl Pruett and Scott Martin filed this § 1983 action against Harris County and the Harris County Bail Bond Board,[1] challenging on various federal and state constitutional grounds, including the First Amendment, a Texas statute governing solicitation of customers, TEX. OCC. CODE § 1704.109 (2003). That statute provides:

> (a) A board by rule may regulate solicitations or advertisements by or on behalf of bail bond sureties to protect:
>
>> (1) the public from:
>>
>>> (A) harassment;
>>> (B) fraud;
>>> (C) misrepresentation; or
>>> (D) threats to public safety; or
>>
>> (2) the safety of law enforcement officers.
>
> (b) A bail bond surety, an agent of a corporate surety or an employee of the surety or agent may not make, cause to be made, or benefit from unsolicited contact:
>
>> (1) through any means, including in person, by telephone, by electronic methods, or in writing, to solicit bonding business related to an individual with an outstanding arrest warrant that has not been executed, unless the bail bond surety or agent for a corporate surety has an existing bail bond on the individual; or
>> (2) in person or by telephone to solicit bonding business:
>>
>>> (A) that occurs between the hours of 9 p.m. and 9 a.m.; or
>>> (B) within 24 hours after:

---

[1] The Board, a creature of Texas statute, is responsible for supervising and regulating the bond business and enforcing bond rules and statutes. TEX. OCC. CODE § 1704.101, .102 (2005). The State of Texas declined to intervene, hence Harris County and the Board ("Harris County") defend the statute.

2

(i) the execution of an arrest warrant on the individual; or
(ii) an arrest without a warrant on the individual.

(c) This section does not apply to a solicitation or unsolicited contact related to a Class C misdemeanor.

The plaintiffs challenge subsection (b), which contains two prohibitions. Subsection (b)(1) prohibits any solicitation regarding an outstanding warrant, unless the subject of the warrant is a previous customer. Subsection (b)(2) restricts the time of solicitation after arrest, prohibiting solicitation in person or by phone from 9:00 p.m. to 9:00 a.m., or within 24 hours after a person has been arrested, either with or without a warrant. The statute does not prevent attorneys, law enforcement officials, or anyone else from alerting someone that he's the subject of an open warrant. Law enforcement officials frequently send letters to petty defendants giving notice of open warrants against them, hoping they'll turn themselves in.

Bondsmen use several methods to solicit business. One particularly useful tool is the Harris County Justice Information Management System (JIMS), a computer system accessible to the public through terminals and the Internet which provides, *inter alia*, names and addresses of persons arrested and subjects of arrest warrants. Given the public's ease of access to JIMS, Harris County waits 48 hours after an arrest warrant is issued to post the information about the warrant on JIMS, allowing law enforcement officers to execute the warrant first.

3

The district court granted the bondsmen's motion for summary judgment, holding the statute unconstitutional and enjoining its enforcement. It granted in part the plaintiffs' motion for fees, awarding them $50,000 plus $25,000 in the event of appeal. Harris County appeals the judgment, including the award of fees, and plaintiffs cross-appeal the award of fees, asking for more.[2]

## II

The metaphor of political speech finding its place in the marketplace of ideas proved to be a powerful if inexact force, drawing speech in its myriad presentations under the umbrella of First Amendment protection —— the force of the metaphor itself a validating testament to the power of an idea so strong as to invite confusion of metaphorical imagery with defining principle. And in 1975, with the Supreme Court's decision in *Bigelow v. Virginia*,[3] speech in the marketplace of actual goods itself gained protection, albeit as "less valuable speech," termed "commercial speech." It

---

[2] In early 2001, Harris County adopted by local rule solicitation restrictions similar to those of current § 109(b). Later that year, the Texas legislature enacted the original version of § 109, which allowed local boards to regulate solicitation. In 2002, plaintiff Pruett challenged the local rules in state court. The trial court held the rules unconstitutional, *see Harris County Bail Bond Board v. Pruett*, No. 01-02-01043-CV, 2004 WL 2307362 (Tex. App. -Houston [1 Dist.] Oct. 14, 2004, no pet. h.), the appellate court partially reversed, 177 S.W. 3d 260 (Tex. App. 2005), and the case is pending before the Supreme Court of Texas. The present case involves current § 109(b), which was enacted in 2003 but concerns issues similar to those in the state court case. However, the present case involves a central issue of federal constitutional law, and although we abstain from ruling on issues of Texas constitutional law, *see Railroad Com. v. Pullman Co.*, 312 U.S. 496 (1941), we rarely abstain from ruling on federal constitutional law, *see Pennzoil v. Texaco, Inc.*, 481 U.S. 1 (1987); *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800 (1976), and do not do so here.

[3] 421 U.S. 809 (1975).

4

signifies that commercial speech did not displace otherwise protected speech in gaining First Amendment protection. That a book or article is sold or a column is written for compensation does not eliminate its protection.[4] In sum, commercial speech, with its lesser protection, is at bottom advertising. As the parties and the court below recognized, § 1704.109 is a restriction on commercial speech.

Restrictions on commercial speech are analyzed under the framework of *Central Hudson*.[5] The government may ban misleading commercial speech and commercial speech related to illegal activity. "If the communication is neither misleading nor related to unlawful activity, the government's power is more

---

[4] *See Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 761-62 (1976).

[5] *See Central Hudson Gas & Elec. Corp. v. Pub. Serv. Com. of New York*, 447 U.S. 557, 563-64 (1980). The parties quarrel about what level of scrutiny *Central Hudson* mandates. Citing *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484 (1996), the plaintiffs urge something "akin to strict scrutiny." *44 Liquormart*, however, was a plurality opinion involving "a blanket prohibition against truthful, nonmisleading speech about a lawful product," *id.* at 504, and there's no blanket prohibition here. In any event, the Supreme Court has called *Central Hudson* a form of "intermediate" scrutiny. *See Edenfield v. Fane*, 507 U.S. 761, 767 (1993); *see also Florida Bar v. Went for It, Inc.*, 515 U.S. 618, 623 (1995); *cf. Thompson v. Western States Med. Ctr.*, 535 U.S. 357, 374 (2002) (describing the test as "significantly stricter" than rational basis). The precise label for the level of scrutiny embodied in *Central Hudson* is irrelevant, however - we just apply the test. Likewise, the plaintiffs' assertion that the *Central Hudson* test isn't the same as the time, place, and manner test, while true, *see Speaks v. Kruse*, 445 F.3d 396, 400 n.10 (5th Cir. 2006), is axiomatic.
The plaintiffs also suggest that strict scrutiny should apply because the restrictions here are content-based. This argument has no merit - § 1704.109 is a classic restriction on a category of commercial speech, a restriction that involves methods, times, and subjects of solicitation and does not have as a goal the suppression of speech. *See, e.g., Speaks*, 445 F.3d at 400 (examining similar restriction on chiropractor solicitation as a restriction on commercial speech).

circumscribed."[6]  First, "[t]he State must assert a substantial interest to be achieved by restrictions on commercial speech."[7] Second, "the restriction must directly advance the state interest involved."[8]  Third, "if the governmental interest could be served as well by a more limited restriction on commercial speech, the excessive restrictions cannot survive."[9]  We review the lower court's application of this test *de novo*.[10]

Before we apply *Central Hudson* to the two restrictions at issue, we address a fundamental dispute coloring much of the parties' arguments and the lower court's ruling.  The plaintiffs argue that only evidence created before enactment of § 1704.109 and relied upon or cited by the legislature in passing it can be considered under *Central Hudson*.  Consequently, they argue, because the legislative record behind § 1704.109 is bare, it cannot survive scrutiny.  Harris County disagrees, offering testimony and affidavits introduced in the court below and arguing that *Moore v. Morales*[11] relied upon testimony at trial in ascertaining the

---

[6] *Central Hudson*, 447 U.S. at 564.

[7] *Id.*

[8] *Id.*

[9] *Id.*  Despite the language of the third prong, the Supreme Court and, thus, this court do not require that the state use the least-restrictive means.  *See, e.g., Speaks*, 445 F.3d at 401 n.14.

[10] *See Speaks*, 445 F.3d at 399.

[11] 63 F.3d 358, 362-63 (5th Cir. 1995).  Harris County also relies on *BGHA, LLC v. City of Universal City, Texas,* 340 F.3d 295, 299 (5th Cir. 2003) (discussing J&B Entertainment, Inc. v. City of Jackson, 152 F.3d 362, 371 (5th

6

justification for a statute.  The district court agreed with the plaintiffs, although it held that § 1704.109 failed scrutiny even considering Harris County's additional evidence.

*Central Hudson* does not require that evidence used to satisfy its strictures exist pre-enactment.  Plaintiffs rely heavily on the statements in *Edenfield v. Fane* that a statute cannot be justified "by mere speculation or conjecture" and that "the *Central Hudson* standard does not permit us to supplant the precise interests put forward by the State with other suppositions."[12]  Those statements, however, only distinguish between rational basis review, under which a court can, and should if necessary, confect its own reasons to justify a statute, and *Central Hudson* review, under which a court can consider only the reasons proffered by the state.  While with commercial speech the state need not demonstrate that its regulatory means were the least intrusive on protected speech,[13] it must at least articulate regulatory objectives to be served.  But that doesn't mean the state can proffer only reasons locatable in the legislative record.  Indeed, in *Moore*, our most relevant case, the court's language shows that it considered post-enactment

---

Cir. 1998), which allowed the city to justify an ordinance based on evidence adduced at trial).

[12] 507 U.S. 761, 768, 770 (1993); *see also Went for It*, 515 U.S. at 624 (quoting *Edenfield*).  The plaintiffs cite to other cases, like *U.S. West, Inc. v. F.C.C.*, 182 F.3d 1224 (10th Cir. 1999), which simply restate this rule.

[13] *See supra* note 6.

7

evidence in analyzing a *Central Hudson* claim.[14]  Even with a First

Amendment doctrine calling for "intermediate scrutiny" such as

regulation of sexually-oriented businesses, where the argument to

disallow post-enactment evidence as justification for a statute has

some logical purpose, we have specifically rejected the plaintiffs'

contention that evidence of purpose must be drawn only from a

contemporaneously generated legislative record.  And there the

threshold question is whether the legislative body is regulating

protected activity or its effects.[15]  We consider the testimony and

affidavits introduced by Harris County in the court below, as the

district court did in the alternative.

### A

We turn first to subsection (b)(1), which prevents

solicitation regarding outstanding warrants unless the bondsman has

a prior relationship with the party.  Harris County concedes that

---

[14] 63 F.3d 358, 362-63 (5th Cir. 1995) (stating "[b]efore us is extensive evidence" and, twice, "[t]hey testified").  In their brief, plaintiffs suggest that this "evidence" and "testimony" was actually pre-enactment "evidence" and "testimony," presumably created in connection with the legislation itself.  The district court's ruling, however, makes clear that the evidence was developed at trial.  *See Moore v. Morales*, 843 F. Supp. 1124 (S.D. Tex. 1994).

[15] *See Illusions-Dallas Private Club, Inc. v. Steen*, 482 F.3d 299 (5th Cir. 1997) (rejecting argument that legislative record or statutory preamble was necessary to discern a content-neutral purpose for statute); *J&B Entm't, Inc. v. City of Jackson*, 152 F.3d 362, 371 (5th Cir. 1998) (allowing use of evidence of secondary effects developed pre-enactment or adduced at trial).  Plaintiffs cite other cases that seem to disagree, *see Peek-a-Boo Lounge of Bradentown, Inc. v. Manatee City*, 337 F.3d 1251, 1265-67 (11th Cir. 2003); *Hickerson v. City of New York*, 146 F.3d 99, 105 (2d Cir. 1998); *11126 Baltimore Blvd. v. Prince George's County*, 886 F.2d 1415, 1423 (4th Cir. 1989), *judgment vacated by* 496 U.S. 901 (1990); *SOB, Inc. v. County of Benton*, 317 F.3d 856, 862 (8th Cir. 2003); *D.H.L. Associates v. O'Gorman*, 199 F.3d 50, 57-58 (1st Cir. 1999), but those cases aren't controlling, of course.

the solicitations at issue are neither deceptive nor relate to illegal activity.  Next, under the first prong of *Central Hudson*, Harris County asserts as substantial interests the diminishment of: 1) the flight risk for felony offenders and high-level misdemeanor offenders; 2) the risk of harm to officers, defendants, and bystanders when such defendants are arrested; 3) the risk of harm to victims, family members, or witnesses from retribution; and 4) the potential for destruction of evidence, interests alluded to in the statute itself.[16]  The district court found that these interests were substantial.  We agree, although to the extent that Harris County itself notifies non-serious offenders of open warrants against them - and the evidence shows that Harris County does this regularly[17] - the interests are not substantial at all.  Deferring that concern to the third prong, where it more easily fits, and assuming the interests are substantial in the abstract, we turn to the second prong.

Under the second prong, Harris County must show that (b)(1) directly advances these interests.  Witnesses for Harris County

---

[16] The plaintiffs argue that the legislature's purpose in enacting § 109 was to hinder competition between large, affiliated bondsmen and independent bondsmen, but their evidence largely relies upon claims that the legislature responded to strong anti-competitive lobbying by Pruett's and Martin's competitors, International Fidelity Insurance Company.  In any event, even if the impulses behind § 109 were anti-competitive, § 109 could still be supported by other, legitimate interests.

[17] *See, e.g.*, Affidavit of Sergeant Larry Hall.  (Hall, employed by the Harris County Sheriff's office since 1976, described the County's notification policy, which allows the County to "wean out possibly dangerous misdemeanants and send notification letters only to non-threatening, non-serious misdemeanants who are likely to save Harris County money and serve public policy by voluntarily coming in and making appropriate arrangements . . . . ")

testified that executing arrest warrants is dangerous, that maintaining the "element of surprise" is important in decreasing the target's ability to flee, resist, harm people, or destroy evidence, and that bondsman solicitation has, in certain past anecdotal incidents, tipped off criminals and caused problems.[18] Although other Harris County witnesses testified that they knew of no instances where bondsman solicitation had caused a problem, and the bondsmen's main expert witness testified similarly, we accept as true the testimony supporting the County, given the procedural posture of this case. We note, however, that the record does not indicate the date of many of the incidents described and fails to reflect, in several instances, which incidents occurred before institution of the 48-hour JIMS window. At least one anecdote, however, references an individual suspected of manufacturing methamphetamine who had received a tip that he would be arrested and opened fire on police officers when they arrived to arrest him in 1988.[19] Presumably such a suspect would be targeted, and

---

[18] *See, e.g.*, Oral Deposition of Alvin W. Berry ("The element of surprise . . . does not give the defendant or the person to be arrested the ability to either flee or to resist."); Affidavit of James Fitzgerald (describing how a murder suspect fled after receiving solicitation from a bondsman and was missing for about six days before being apprehended); Affidavit of Rodney Marcotte ("[A]fter apprehending suspects, they have indicated to me that they fled immediately after receiving notice of solicitation by one or more bondsmen."); Affidavit of Sergeant Kent Radney (describing how a suspect, aware that he would be arrested, greeted police officers with open fire).

[19] Cross-Examination of Bruce Douglas Carr, discussing how the incident discussed in Sergeant Radney's affidavit occurred in 1988, prior to the implementation of JIMS. *See also* Affidavit of Kent Radney (describing the gun battle, which occurred in October 1988).

hopefully caught, within the 48-hour period preceding posting on JIMS. Nevertheless, we accept at this point that (b)(1) directly advances the state's interests.[20]

However, even assuming that (b)(1) advances the stated interests, (b)(1) fails prong three of *Central Hudson*. While that prong does not require that the state employ the least-restrictive means to accomplish its goals,[21] it does require a good fit between the means and the goals. Consequently, in determining whether "the means are in proportion to the interests they purport to serve,"[22] it is relevant that other, less-restrictive and more-tailored means exist. The district court found that Harris County could advance the stated interests by the more narrow means of: 1) increasing the number of officers executing warrants, thereby arresting risky offenders before the 48-hour JIMS window expires; 2) extending the 48-hour window; and 3) screening targets for those who could be

---

[20] The bondsmen also argue that (b)(1) does not directly advance the stated interests because it excludes bondsmen with an "existing business relationship." Essentially, they argue that (b)(1) does not go far enough and should not have this exclusion, as some of their witnesses testified. This argument sounds in underinclusivity, and thus may relate more properly to prong three, but in any event we agree with the court in *Harris County Bail Bond Board v. Pruett*, 177 S.W. 3d 260,273-74 (Tex. App. 2005), that this exception is not problematic. First, that court construed "existing business relationship" to mean that "the bondsman involved has in place an existing, current bond on the person requiring another bond." That definition controls here. As the court noted, such a bondsman would want to contact the person because the new warrant might affect his current bond. Moreover, as the court noted, it would be impractical to allow the bondsman to discuss the existing bond but not the possibility of a new bond, and it is unlikely a bondsman would contact someone who he thought would run away because that might lead to forfeiture of the original bond.

[21] *See supra* note 9.

[22] *See Speaks v. Kruse*, 445 F.3d 396, 400 (5th Cir. 2006).

11

notified.  The County complains that the first two alternatives are impractical and the third outside the Texas legislature's control. The first may be impractical.  But the second is not, in the district court's form or in the form we address - wherein the legislature could alter § 109 to include a time limit on solicitation, with a window prior to solicitation that would give police officers time to act.[23]  And here, we note that restrictions on commercial speech without any time limitation are inherently suspect.[24]   Furthermore, some of the County's own witnesses testified that giving law enforcement 72 or 96 hours or so after arrest to serve a warrant before bondsmen could solicit would greatly serve the County's stated interest.[25]  In short, (b)(1) is not narrowly tailored because it prohibits solicitation of targets days, weeks, or even months after warrants are issued.

Furthermore, we agree with the district court that it is telling that Harris County itself, through the Sheriff's

---

[23] After all, whether Harris County could extend the 48-hour JIMS blackout period is irrelevant.  The question is whether § 109 is constitutional as written; indeed, other counties may not have a JIMS-type system at all.  We, and the Supreme Court, often assume in analyzing whether statutes pass constitutional muster that the legislature could enact a more narrowly tailored means.  *See, e.g.*, *Riley v. Nat'l Federation of the Blind of N.C., Inc.*, 487 U.S. 781, 800 (1988) ("In contrast to the prophylactic, imprecise, and unduly burdensome rule the State has adopted to reduce its alleged donor misperception, more benign and narrowly tailored options are available."); *Lindsay v. San Antonio*, 821 F.2d 1103, 1110-11 (5th Cir. 1987) ("For purposes of this opinion, we can assume, *arguendo*, that the traffic safety interest could be furthered by means of a more narrowly tailored ordinance.")

[24] *See Speaks v. Kruse*, 445 F.3d 396, 400-01 (5th Cir. 2006).

[25] Of course, the witnesses were asked whether extending the 48-hour JIMS period would help, but exactly why a blackout of a certain length might exist is irrelevant.

12

Department, notifies thousands of people every year of open warrants against them,[26] as do other law enforcement agencies in the County[27] - Harris County cannot give such notice itself and then claim that restricting notice by others is necessary to the safety of its officers and the public and the prevention of flight. The County urges that it notifies only people charged with "non-serious" misdemeanors, excluding people accused of assaultive crimes, crimes involving family violence, crimes against the person, or any crime of an aggravated nature. The record reveals that the Sheriff's Department does not notify people in this excluded group of assaultative crimes, or people charged with felonies, wanted for revocation of weekend service or off-work hours, wanted for sentencing, wanted for capias profine that

[26] In 2002, a Sheriff's Department Sergeant testified that five night-clerks in the Warrants Division send "more than 20" and perhaps as many as 100 of those letters every night, yielding 7,300 to 36,500 a year. We recognize the tension in our holding that what the Texas legislature, not Harris County, can do regarding a time limit is relevant, but also looking to whom Harris County notifies. We look to what Harris County does only to illuminate why it is possible for the statute itself to screen certain targets more finely than the Class C misdemeanor exclusion that it currently contains.

[27] Harris County Constables notify many Class C misdemeanor targets, who are exempted from § 109. The bondsmen introduced evidence from the constables' websites suggesting that they notify certain Class A and B misdemeanor targets as well, and this appears to be true, although the evidence isn't entirely clear. It's undisputed that the Houston Police Department notifies certain targets, although it's unclear what categories of targets, and does not apprise the Sheriff's Department of whom it notifies. In addition, anyone can call the county clerk and ask whether a warrant exists for someone, and various agencies release names and data through posters, press releases, and broadcast media outlets, but these forms of notification seem less relevant because anyone who cares to find out if he has a warrant is not the type of person about whom Harris County professes concern, and because agencies' publicizing information about certain targets occurs, presumably, after they have tried to catch a target and he has become a fugitive.

13

includes jail time, or wanted in another jurisdiction.[28]  Yet through that screen still fall many Class A and Class B misdemeanor targets, who escape the Class C misdemeanor exclusion of § 109, including oft-sought targets of bondsmen solicitation like petty thieves, people who write hot checks, drivers on suspended licenses, and certain DWI offenders.  Harris County urges that the statute's exclusion of only Class C misdemeanor targets is reasonable because certain Class A and Class B misdemeanors can result in jail of up to 180 or 360 days, even if they are non-violent, rendering the suspects of such crimes liable to run.  That may be true, and we do not cast the legislature's choice to exclude only Class C misdemeanors as unreasonable.  However, under the narrow-tailoring test of *Central Hudson* we note that, as Harris County has done, (b)(1) could reasonably allow solicitation of certain Class A and B misdemeanor targets, those not liable to run.  Combined with its temporal breadth, the breadth of crimes covered by (b)(1) is simply too broad.  We do not hold that Harris County cannot serve its objectives by more narrowly drawn means.  Rather, we hold that Harris County has not yet engaged in the narrow tailoring demanded by the First Amendment.

B

We turn next to subsection (b)(2), which prevents solicitation in-person or by phone between 9:00 p.m. and 9:00 a.m. and within 24

---

[28] Also excluded from receiving notification are those with an unknown name, address, or other personal information.

14

hours after arrest. Harris County contends first that (b)(2)(A) regulates conduct that was already unlawful under the general statute prohibiting solicitation between 9:00 p.m. and 9:00 a.m. and before noon on Sundays, TEX. BUS. & COM. CODE § 37.02(a)(2), hence under the threshold inquiry of *Central Hudson*, (b)(2)(B) survives as a ban on speech relating to illegal activity.[29] This bootstrapping argument fails. The threshold inquiry asks whether the speech is misleading or the product or service spoken about is illegal, and here the speech isn't misleading and the product or service itself - bail bonding - isn't illegal. That § 37.02(a)(2) itself bans speech doesn't save (b)(2)(B). And so we turn to the *Central Hudson* prongs.

Harris County asserts as its substantial interest for (b)(2) the prevention of harassing solicitation, essentially what we have elsewhere called the interest of "privacy," a sufficient interest.[30] But Harris County's argument finds difficulty when its interest is stated more narrowly as the prevention of harassment through bail solicitation and the promotion of privacy of families of persons targeted for arrest. It now differs from solicitation held to be

---

[29] In analyzing the second prong on *Central Hudson*, the district court concluded that § 37.02(a)(2) covers only solicitations of a "consumer good or service," and that bail bonding isn't such a good or service. Although we don't pass on the question, we note that § 37.02(a)(2) seems to cover bail bonding, as the Texas Court of Appeals held in Pruett's related case, *see Harris County Bail Bond Board v. Pruett*, 177 S.W. 3d 260, 275-76 (Tex. App. 2005).

[30] *See Speaks*, 445 F.3d at 400 n.13.

a valid target of legislation.[31] We defer this concern to the next prong, again assuming the interests are substantial in the abstract.

We conclude that the 24-hour window of (b)(2)(B) does not directly advance the state's interest. Harris County offers an affidavit from an employee of the Harris County District Attorney's Office, Kathleen Braddock, stating that the 24-hour period after arrest is the time during which harassing bond solicitations are the worst and that citizen complaints "declined drastically" after Harris County changed its local rules, before the enactment of § 109, to contain essentially what is now § 109. It also offers testimony from four citizens upset at solicitation calls they received. This is insufficient evidence to show that the 24-hour rule directly advances state interests. First, Harris County does not connect the reduction in citizen complaints to the 24-hour rule, as opposed to the other aspects of the amended local rules, particularly the nighttime solicitation ban that we uphold later.[32] Indeed, Braddock's affidavit in the paragraph discussing the 24-hour ban highlights the harassing nature of calls between, especially, midnight and 5 a.m., and three of the four citizens who

---

[31] *See, e.g., id*., at 400 n.13, 398-99 (discussing how "[p]rivacy and the protection of citizens against undue influence are valid substantial state interests" but striking down a Louisiana statute preventing direct solicitation of recent accident victims by health care providers as insufficiently narrowly tailored).

[32] Harris County provides no evidence about the nature of the complaints' pre- and post-rule change, preventing any useful conclusion from the reduction in complaints.

16

testified regarding the 24-hour period stated that they received the unwelcome calls between 9 p.m. and 9 a.m.[33] We hold later that Harris County can ban such nighttime calls. Second, to whatever extent the testimony of the citizens can be read to cover daytime solicitation, we give credence to the common-sense argument that most families would like to know when their members are in jail.[34] Third, Braddock's conclusory statement that solicitation is the worst in the 24-hour period after arrest is insufficient. Notably, the district court held that Harris County fails to explain why, with the implementation of a 24-hour rule, harassing solicitations won't simply begin on the 25th hour. Harris County now offers an explanation which it urges is implicit in Braddock's statement that most harassing solicitation occurs during the first 24 hours following arrest: most people who can afford bond will seek out a bondsman during the first 24 hours, hence bondsmen will have little incentive to call after that period. Even if true, it is no response to an attack on a restriction on speech that the restriction essentially bans all speech. The argument that most bondsmen desire to contact potential customers right away helps

---

[33] The record does not show when the fourth citizen received the unwelcome call.

[34] Harris County presents evidence to the contrary, where individuals argue that they prefer to receive news about a family member being in jail from another family member. Additionally, Harris County argues that many detained suspects are permitted to make a telephone call to family members. Other evidence, however, such as the testimony of criminal defense attorney Albert Fong, suggests that the many people who are contacted by bondsmen regarding a relative in jail have expressed "gratitude" rather than indignation upon receiving this information. Regardless, this is not the crux of our argument, as we focus on the 24-hour window's effect of stifling an unacceptably large proportion of bondsman speech.

explain why solicitation soon after arrest might be prevalent, and therefore harassing, but it also counsels that such a restriction, which prevents speech when it is the most valuable for the speaker and the potential customer,[35] should be viewed with some skepticism. Given the record as a whole, we cannot conclude that Harris County has shown that the 24-hour ban directly serves the interest in privacy.

All that remains is the 9:00 p.m. to 9:00 a.m. restriction. The district court struck that down with the rest of § 109(b), but its rationale for doing so is unclear, although the court seemed to rely partly on its conclusion that the general solicitation timing statute, § 37.02(a)(2), didn't apply to bail bonding. We don't decide that question,[36] although we note that if § 37.02(a)(2) covers bail bonding, then presumably we can't strike down (b)(2)(A) without striking down § 37.02(a)(2), at least "as applied" to bail bonding. We don't face that dilemma because we conclude that (b)(2)(A) survives *Central Hudson* scrutiny. Prohibiting in-person and telephone solicitation at late hours directly and substantially furthers privacy and the prevention of harassing solicitation, and is narrowly tailored to furthering that goal. A nighttime prohibition is inevitably underinclusive because privacy may be lost and harassing solicitation made during the day, but surely the

---

[35] The benefits attending commercial speech flow not just to the speaker, for increased consumer knowledge about any product aids consumer choice and increases competition.

[36] *See supra* note 26.

18

state's interest is more powerful at night. Indeed, we've found no successful challenges to general nighttime solicitation bans.

### III

The plaintiffs also attacked § 109 below on vagueness, equal protection, and Texas law grounds. The district court never addressed these arguments after concluding that § 109 violated the First Amendment. The plaintiffs raise the vagueness and equal protection challenges again on appeal. Hence we must address the vagueness and equal protection arguments as they pertain to (b)(2)(A), the subsection of § 109 most resistant to those arguments. First, (b)(2)(A) is not unconstitutionally vague; two specific types of solicitation of a specific service are banned during a specific time.[37] Second, the plaintiffs' equal protection argument relies entirely on the distinction in (b)(1) between bondsmen with existing client relationships and bondsmen without such relationship - a distinction irrelevant to (b)(2)(A).

Consequently, we affirm the district court's grant of summary judgment to plaintiffs, except for that part enjoining the enforcement of (b)(2)(A), which we reverse.

### IV

After addressing the merits, the district court ordered the bondsmen to file a request for fees, pursuant to 42 U.S.C. § 1988. The bondsmen requested almost $200,000. The defendants argued that

---

[37] *See Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498 (1982).

19

"special circumstances" should preclude or reduce any award,[38] and they also attacked specific line-items submitted by the bondsmen. The court took no issue with the line-items, but it noted its concern with whether any award should issue given that "(a) Harris County is not involved in the regulation of bail bondsmen; (b) the Harris County Bail Bond Board is not a policy making body; it merely enforces the laws and policies of the state of Texas; and (c) neither Harris County nor the Bail Bond Board enforced the statute against the plaintiffs." The court then awarded what it called "nominal" fees, $50,000, with $25,000 more in the event of appeal. In its August 18, 2005 notice of appeal, Harris County appealed both the underlying merits and the award of fees, urging again that "special circumstances" exist precluding any award of fees. After later, unsuccessful attempts to modify that award, the plaintiffs cross-appealed the issue of fees, asking that we award more money or remand with instructions to award more money because the court's three findings quoted above were erroneous.

At the outset, the parties skirmish over whether the bondsmen's cross-appeal was timely.[39] We need not address this issue because Harris County's appeal, including an appeal of fees awarded, was timely, and that appeal focused on the same question -

---

[38] *See Houston Chronicle Pub. Co. v. City of League City, Tex.*, 488 F.3d 613, 623 (5th Cir. 2007) (explaining the "special circumstances" exception of *Hensley v. Eckerhart*, 461 U.S. 424, 429 (1983) (quoting a Senate Report behind § 1988 that "a prevailing plaintiff 'should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust'")).

[39] *Browder v. Director, Dep't of Correction*, 434 U.S. 257, 264 (1978) (holding that a timely notice of appeal is jurisdictional).

20

whether and to what extent the district court could consider the fact that defendants were not the promulgator, or arguably the enforcer,[40] of the statute at issue.

We review a district court's determination of special circumstances for abuse of discretion;[41] although this is a highly deferential standard of review, we find here that because plaintiffs fully succeeded in the case below,[42] the court's award of "nominal" attorneys' fees to plaintiffs based on defendants' lack of participation in policymaking or regulation of bondsmen was an erroneous interpretation of the special circumstances that the Court in *Hensley*[43] indicates could render an award unjust.

We have held that given the strong policy behind § 1988 of awarding fees to prevailing plaintiffs, defendants must make an "extremely strong showing" of special circumstances to avoid paying

---

[40] The parties dispute whether defendants did, or were about to, enforce § 109 against them.

[41] *Johnson v. Mississippi*, 606 F.2d 635, 637 (5th Cir. 1979).

[42] The district court declared § 109 unconstitutional, found that defendants were liable under § 1983 for "depriving plaintiffs of their constitutional rights," and enjoined defendants from enforcing the statute. The only point on which the court disagreed with plaintiffs was on their request for damages; it granted an injunction in lieu of damages. The court also declined to address plaintiffs' alternative claims, since it found the statute unconstitutional under their First Amendment claim.

[43] Defendants relied on the *Hensley* case in their response to plaintiffs' motion for attorneys' fees, arguing that "'special circumstances . . . would render . . . an award [of attorney fees and costs] 'unjust.'" Defendants Harris County Bail Bond Board's Response to Plaintiffs' Motion to Recover Attorney Fees, Expert Fees and Expenses (citing *Hensley,* 461 U.S. at 429 (1983)).

attorneys' fees[44] and that "the discretion to deny § 1988 fees is . . . extremely narrow."[45] That a defendant does not promulgate a policy does not eliminate the costs the plaintiff had to bear in securing his rights, hence even defendants lacking culpability and acting in good faith should pay attorneys' fees.[46] Defendants here failed to make an extremely strong showing of special circumstances. Even if defendants had made an extremely strong showing that rose to the level of special circumstances, this circuit has never held that such "special circumstances" can serve to reduce, and not fully eliminate, an award of fees.[47]

---

[44] *See Houston Chronicle Pub. Co. v. City of League City, Tex.*, 488 F.3d 613, 623 (5th Cir. 2007).

[45] *Espino v. Besteiro*, 708 F.2d 1002, 1005 (5th Cir. 1983) (citing *Ellwest Stereo Theatre, Inc. V. Jackson,* 653 F.2d 954, 955 (5th Cir. 1981)).

[46] *See Hopwood v. State of Texas*, 236 F.3d 256, 278 (5th Cir. 2000) (noting that § 1988 provides fees under a "private attorney general theory"); *Williams v. Hanover Hous. Auth.*, 113 F.3d 1294, 1301-02 (1st Cir. 1997)("The circuits are in agreement . . . that defendants' good faith reliance even on settled law . . . is not a 'special circumstance' warranting a denial of attorneys' fees under § 1988."); *Lampher v. Zagel*, 755 F.2d 99, 104-05 (7th Cir. 1985) (holding that defendants'"good faith" is not sufficient and that local official's enforcement of state law he thought valid was not sufficient); *Martin v. Heckler*, 773 F.2d 1145, 1149-52 (11th Cir. 1985) (concluding that state agency which merely enforced federal law and did not write policy failed to present "special circumstances" to justify denial of all fees). In essence, as long as a plaintiff's lawsuit played some role in his eventually obtaining relief - as opposed to, say, a defendant who gratuitously confers relief - he can recover fees. *See Lampher*, 755 F.2d at 104-05.

[47] We find only one case, from the Third Circuit, that has allowed a partial reduction of fees in lieu of all-out elimination of fees under the special circumstances test; the court wrote this opinion directly after the *Hensley* decision, when few other interpretations of that case were available. *See Inmates of Allegheny County Jail v. Pierce*, 716 F.2d 177, 179 (3d Cir. 1983)("[W]e note that *Hensley* was announced after the filing of the district court opinion in the instant case so that the court below did not have the benefit of the Supreme Court's latest teachings.")

22

The district court would have had more discretion to reduce the County's attorneys' fees in the case below if plaintiffs had partially rather than fully succeeded on their claims,[48] as they have on appeal. Under *Hensley*'s standard for partial success (a different standard than the "special circumstances" that occasionally allow a defendant to avoid attorneys' fees altogether), a court may award reduced fees to plaintiffs that are prevailing parties but have lost on some claims.[49] The court may use its "equitable discretion" to "arrive at a reasonable fee award, either by attempting to identify specific hours that should be eliminated or by simply reducing the award to account for the limited success of the plaintiff."[50] Plaintiffs did not have "partial success" in the district court, however; they won their case yet they received nominal fees.

Because the court erred in applying the special circumstances test in the case below, and because Harris County has now prevailed

---

[48] *See supra* note 42, discussing plaintiffs' success on all claims with the minor exception of the court's decision to grant an injunction, not damages. Even if the court, in its discretion, had considered this minor exception as a "failure" on a claim, the court did not conduct the correct *Hensley* analysis for partial success but rather (it appears) relied more generally on the special circumstances exception to substantially reduce the award. Additionally, even if the court had conducted a *Hensley* analysis for partial success, plaintiffs would likely have merited a full fee award under the applicable *Hensley* test because plaintiffs soundly won the majority of their claims. *See Hensley*, 461 U.S. at 440 ("Where a lawsuit consists of related claims, a plaintiff who has won substantial relief should not have his attorney's fee reduced simply because the district court did not adopt each contention raised.")

[49] *Hensley*, 461 U.S. at 436.

[50] *Tex. State Teachers Ass'n v. Garland Indep. Sch. Dist.*, 489 U.S. 782, 789-90 (1989), (citing *Hensley*, 461 U.S. at 437).

on one issue, we must vacate and remand the award of fees to allow the district court to award fees appropriate to plaintiffs' now partial success in both the district court as well as on appeal.[51]

We AFFIRM IN PART and REVERSE IN PART the district court's decision on the merits.  We VACATE AND REMAND the district court's award of fees for further consideration.

---

[51] *See Hensley*, 461 U.S. at 435 (explaining that, under § 1988, a party cannot recover fees for legal services on unsuccessful claims, although sometimes unsuccessful and successful claims can be so related as to warrant fees for time spent on the combined claims).