Filed 11/5/13

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>TODD RUSSELL DOLEZAL,<br><br>    Defendant and Appellant. | 2d Crim. No. B245316<br>(Super. Ct. No. F457098)<br>(San Luis Obispo County) |

A bail bondsman seeks refuge under the First Amendment umbrella.  Is he a champion of commercial constitutional speech rights just trying to make a living by directly soliciting bail bond business at a county jail or has he committed a crime?  A bail bondsman has a right to make a living but the bonding rules require compliance with the Insurance Code and the regulations promulgated by the insurance commissioner.  We have balanced the competing rights.  We conclude that the narrowly tailored restriction on commercial speech prohibiting the direct solicitation of bail at a jail, passes constitutional muster,

Todd Russell Dolezal appeals his conviction by the trial court on stipulated facts, of one count of unlawful contact for bail solicitation in violation of Insurance Code, section 1814 and California Code of Regulations, title 10, chapter 5, section 2079.1.[1] The trial court declared the offense to be a misdemeanor (Pen. Code,

_____

[1] All statutory references are to Title 10 of the California Code of Regulations, unless otherwise stated.

1

§ 17, subd. (b)(3)), ordered appellant to pay a fine of $1,000 and placed appellant on probation for a period of one year.

Appellant contends the conviction must be reversed because the administrative regulation that criminalizes solicitation of bail violates the First Amendment to the United States Constitution. The regulation was adopted by the Department of Insurance in 1977. This is the first time its constitutionality has been considered. We conclude the regulation is narrowly tailored and serves the state's substantial interests in protecting the orderly administration of jail facilities and in protecting arrestees from harassment, intimidation, fraud or other forms of overreaching common in direct solicitation of bail.

*Facts and Procedural History*

Appellant is a licensed bail agent who does business in San Luis Obispo County as San Luis Bail Bonds. Larissa Langley is employed by appellant and is also a licensed bail agent.

In the early morning hours of April 10, 2009, Kathryn Schildwachter was arrested for corporal injury to her husband (Pen. Code, § 273.5), and booked into the San Luis Obispo County jail. Jail staff initially told her that she would be going to court that day and would probably be released on her own recognizance. Schildwachter was not overly concerned and believed she would get out of jail soon. When jail staff later told Schildwachter she would not be going to court that morning, Schildwachter tried unsuccessfully to contact her husband. She did not contact any bail bondsman herself, or direct anyone to do so on her behalf.

Meanwhile, Schildwachter's husband arranged for her bail with Smitty's Bail Bonds. He had previously used Smitty's Bail Bonds and did not consider contacting any other bail agent. Before going to work, Mr. Schildwachter went to the office of Smitty's Bail Bonds and paid for his wife's bail.

At about 9:00 a.m., jail staff took Mrs. Schildwachter to the secured visiting area and told her a bail agent was there to see her. Mrs. Schildwachter

2

believed her husband had sent the bail agent to get her out of jail. The bail agent, however, was Larissa Langley, not the agent from Smitty's who had already been paid by Mr. Schildwachter. Langley and Schildwachter agreed on terms and Langley left the visiting area to arrange Schildwachter's bail.

Schildwachter remained in the visiting area. Another bail agent, Justin Hendrix from Smitty's, entered and sat down across from her. Hendrix told Schildwachter he was her bondsman and that her husband had already bailed her out.

Before meeting with Schildwachter, Hendrix spoke with Larissa Langley in the jail's reception area. He told Langley that he was bailing Mrs. Schildwachter. Langley handed Hendrix the bail information she received from jail personnel and left the premises. Hendrix then completed the process of bailing Mrs. Schildwachter.

Appellant and Langely were charged with soliciting bail, in violation of section 2079.1. As relevant here, the regulation states: "Any solicitation [regarding bail] of an arrestee himself . . . shall be only after a bona fide request for bail services has been received from the arrestee or from a person specified in Section 2079 (b) or (c) . . . ." (Cal. Code Reg.s, titl. 10, § 2079.1.) Section 2079 provides, "No bail licensee shall solicit bail except in accordance with Section 2079.5 and from: [¶] (a) An arrestee; [¶] (b) The arrestee's attorney; [¶] (c) An adult member of the arrestee's immediate family; or [¶] (d) Such other person as the arrestee shall specifically designate in writing . . . ." (Cal. Code Regs., titl. 10, § 2079.)[2] Insurance Code section 1812 grants the Insurance Commissioner authority to enact administrative regulations governing bail agents. Section 2079.1 is one of those regulations. Insurance Code section 1814 provides, "The violation of . . . any rule of the [insurance] commissioner [relating to bail agents] is a public offense, punishable by fine not exceeding ten thousand dollars ($10,000), or by imprisonment pursuant to subdivision (h) of Section

---

[2] There is no Section 2079.5 in the current title 10 of the California Code of Regulations.

1170 of the Penal Code, or in the county jail not exceeding one year, or by both that fine and imprisonment." (Ins. Code, § 1814.)

Appellant demurred to the felony complaint, contending section 2079.1 could not be enforced against him because it violates his right to free speech under the First and Fourteenth Amendments to the United States Constitution. At the hearing on the demurrer, Andrew Gulcher, a senior investigator with the Department of Insurance, testified that section 2079.1, "regulates the administration of justice to which bail agents are a part of. Bail is a right. It sort of regulates an orderly fashion in which there's an even playing field for all licensees in the state. It prevents bail agents from listening to scanners and responding to scenes where someone may actually be arrested out in the field and following them back to the jail. It prevents, you know, multiple bail agents competing and trying to solicit in sort of a bidding war within jail facilities or in court facilities."

In addition, the ban on direct solicitation protects arrestees from "undue influence" given the "stressful situation" the arrestees are under. "Being confused, stress[ed], in a jail environment, having just been in custody, embarrassment, a lot of concerns in their mind about what's going to happen to them. They wouldn't have had time to consult with family members or friends to determine what is financially best for them . . . in terms of when they should be released or if they should even request bail at that time."

Mr. Gulcher further explained that bail agents are allowed to advertise in most jail facilities. "Oftentimes [arrestees] have access to phone books where bail agents can advertise. [Arrestees are] allowed to make phone[ calls] to friends and family members. And they can call their family or attorney to arrange for bail for them and in an environment that is a little more conducive to clear thinking."

These observations were based, Mr. Gulcher testified, on discussions he had with other employees of the Department of Insurance, including its legal department, similar prosecutions filed in other counties and complaints by the public.

He was not aware of any reports or studies concerning statewide problems in the bail industry.

The trial court overruled the demurrer. The parties then agreed to a court trial on, stipulated facts. All charges against Langley were dismissed. The trial court found appellant guilty of a felony violation of section 2079.1. It then reduced the conviction to a misdemeanor pursuant to Penal Code section 17, subdivision (b)(3).

*The California Bail Regulation Is Constitutional*

Speech that proposes a commercial transaction is entitled to the protection of the First Amendment if it concerns a lawful activity and is not misleading. (*Central Hudson Gas & Elec. Corp. v. Public Service Comm'n. of New York* (1980) 447 U.S. 557, 563-564 [65 L.Ed.2d 341].) Assuming that threshold is met, the government "must assert a substantial interest to be achieved by restrictions on commercial speech. Moreover, the regulatory technique must be in proportion to that interest. The limitation on expression must be designed carefully to achieve the State's goal. Compliance with this requirement may be measured by two criteria. First, the restriction must directly advance the state interest involved; the regulation may not be sustained if it provides only ineffective or remote support for the government's purpose. Second, if the governmental interest could be served as well by a more limited restriction on commercial speech, the excessive restrictions cannot survive." (*Id.* at p. 564.)[3]

_____

[3] Broadly speaking, there are three levels of constitutional scrutiny: strict, intermediate and rational basis. We are directed by the Supreme Court to "engage in 'intermediate' scrutiny of restrictions on commercial speech . . . ." (*Florida Bar v. Went for It, Inc., supra,* 515 U.S. at p. 623.) Other forms of speech, by contrast, receive far greater constitutional protection. " '[A]s a general matter, "the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter or its content." ' " (*Ashcroft v. American Civil Liberties Union* (2002) 535 U.S. 564, 573.) Thus, content-based restrictions on speech and other forms of expression are presumed invalid and are subjected to strict constitutional scrutiny. (*United States v. Alvarez* (2012) 567 U.S. ___, ___ [183 L.Ed.2d 574, 586].) Under this demanding standard, it is the government's burden to demonstrate that the

The state is not required, pursuant to this intermediate level of constitutional scrutiny, to demonstrate that its regulations adopt the least restrictive means available to serve its substantial interests. (*Florida Bar v. Went For It, Inc.* (1995) 515 U.S. 618, 632 [132 L.Ed.2d 541].) Instead, the First Amendment requires a " ' "fit" between the legislature's ends and the means chosen to accomplish those ends,' [citation] -- a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is ' in proportion to the interest served, ' [citation]; that employs not necessarily the least restrictive means but . . . a means narrowly tailored to achieve the desired objective." (*Board of Trustees S.V.N.Y. v. Fox* (1989) 492 U.S. 469, 480 [106 L.Ed.2d 388].)

The regulation at issue here prohibits a bail agent from directly soliciting an arrestee without a prior request from the arrestee. The bail agent may still solicit the arrestee's attorney, family members or friends and may also advertise his or her services in every form of media. Jails routinely provide arrestees with access to telephones and telephone books, which contain many bail agent advertisements.

Appellant contends as follows: The regulations unreasonably interfere with bail agents' First Amendment right to provide potential clients with information about their services. The regulations also unreasonably interfere with arrestees' right to receive such information from bail agents they have not previously contacted. Some arrestees may be unable to access bail through print advertisements, due to

---

regulation at issue "is justified by a compelling government interest and is narrowly drawn to serve that interest. [Citation.] The State must specifically identify an 'actual problem' in need of solving, [citation] and the curtailment of free speech must be actually necessary to the solution . . . ." (*Brown v. Entertainment Merchants Assn.* (2011) 564 U.S. ___, ___ [180 L.Ed.2d 708, 720].) At the other end of the constitutional spectrum are government regulations that limit conduct only tangentially related to speech. (*Ysursa v. Pocatello Educ. Assn.* (2009) 555 U.S. ___ [172 L.Ed.2d 770].) Such regulations are subject to the least restrictive form of scrutiny: rational basis review. Under this deferential standard, "the State need only demonstrate a rational basis to justify" a regulation. (*Id.* at p. 778.)

language barriers, disabilities or illiteracy. For these arrestees, the ban on direct personal solicitation may result in a total denial of the right to bail.

Respondent contends the regulation against direct solicitation of bail advances three substantial state interests. First, it protects recent arrestees against harassment, intimidation, overreaching, annoyance or invasions of privacy by bail agents clamoring for their business. Second, it protects orderly and efficient jail administration by prohibiting bail agents from "jail rushing," e.g., congregating in jail intake and visiting areas to troll for business after a desirable arrestee has been detained. Finally, bail agents are licensed professionals who are an integral part of the criminal justice system. Without them, most arrestees could not exercise their right to bail. The state has an interest in regulating their work to make sure that they operate in a fair, honest and professional manner.

According to respondent, section 2079.1 directly advances these interests by prohibiting direct bail solicitation without a prior request from the arrestee. Because a bail agent cannot contact an arrestee unsolicited, the bail agents have nothing to gain by harassing or badgering arrestees. Similarly, they have little incentive to loiter in or around the jail, interfering with its orderly and efficient administration.

Each of the interests identified by respondent has been recognized as substantial in the context of First Amendment challenges to the regulation of commercial speech. In *Edenfield v. Fane* (1993) 507 U.S. 761 [123 L.Ed.2d 543], the court recognized that Florida had a substantial interest in protecting potential consumers from fraud, overreaching, intimidation, annoyance, harassment or invasions of privacy during direct personal solicitation. (*Id.* at pp. 768-769; see also *Ohralik v. Ohio State Bar Assn* (1978) 436 U.S. 447, 462 [56 L.Ed.2d 444] ["the State has a legitimate and indeed 'compelling' interest in preventing those aspects of solicitation that involve fraud, undue influence, intimidation, overreaching, and other forms of 'vexatious conduct.' "].) *Edenfield* also acknowledged "the State's important interests

in maintaining standards of ethical conduct in the licensed professions." (*Id.* at p. 770; see also *Florida Bar v. Went for It, Inc., supra,* 515 U.S. at p. 625 [state has compelling interest in licensing and regulating the practice of professions].)  Finally, the state has a substantial interest in protecting the orderly administration of justice. (*Florida Bar v. Went for It, Inc., supra,* 515 U.S. at p. 624.)

In *Ohralik v. Ohio State Bar* (1978) 436 U.S. 447, the Supreme Court upheld against a First Amendment challenge, a state bar disciplinary rule prohibiting lawyers from engaging in direct, in-person solicitation of clients.  The court noted that in-person solicitation, like print advertisement, provides potential clients with information about a lawyer's availability and the terms upon which he or she will provide legal services.  The solicitation may also educate the potential client about his or her legal rights and remedies.  But, the court noted, in-person solicitation also poses risks not presented by print advertisement.  "Unlike a public advertisement, which simply provides information and leaves the recipient free to act upon it or not, in-person solicitation may exert pressure and often demands an immediate response, without providing an opportunity for comparison or reflection."  (*Id*. at p. 457.)  The potential for overreaching is extremely high in this context, both because the in-person solicitation is likely to be one-sided and because the potential client is in a very stressful, unfamiliar situation.  Consequently, the potential client "may place his trust in a lawyer, regardless of the latter's qualifications or the individual's actual need for legal representation, simply in response to persuasion under circumstances conducive to uninformed acquiescence."  (*Id.* at p. 465.)  "[U]nder these adverse conditions the overtures of an uninvited lawyer may distress the solicited individual simply because of their obtrusiveness and the invasion of the individual's privacy, even when no other harm materializes.  Under such circumstances, it is not unreasonable for the State to presume that in-person solicitation by lawyers more often than not will be injurious to the person solicited."  (*Id.* at pp. 465-466, fns. omitted.)

8

The court reached the opposite conclusion in *Edenfield v. Fane, supra,* 507 U.S. 761 [123 L.Ed.2d 543], where it held Florida's ban on in-person solicitation by certified public accountants (CPAs) "inconsistent with the free speech guarantees of the First and Fourteenth Amendments." (*Id.* at p. 763.) *Edenfield* noted several distinctions between in-person solicitation by CPAs and by lawyers. CPAs are not trained in persuasion, like lawyers. Their clients tend to be sophisticated business people whose decision to retain a CPA is generally not made under stress or during an emergency. Potential CPA clients ordinarily have time to check references and deliberate before choosing whether to retain a CPA. (*Id.* at pp. 774-775.) Because there was a much lower risk that in-person solicitation by a CPA would involve overreaching, fraud or invasions of the potential client's privacy, the court held the ban on in-person solicitation by CPAs could not be justified as a prophylactic rule. (*Id.* at p. 777.)

We believe that arrestees who have recently been taken into custody are more like the accident victims at issue in *Ohralik, supra,* than the sophisticated business people described in *Edenfield, supra*. Most people find being in jail to be a very stressful situation. For many arrestees, a bail agent is the only person who can secure their release. But an arrestee may also lack information about his or her court schedule or custody status and may not be able to fairly evaluate the terms offered by a particular bail agent, to decide whether to contact other agents or to wait until their court appearance to request release without bail. A bail agent who appears unsolicited in the jail visiting area with paperwork ready to be signed could impose pressure on an arrestee to make an immediate decision. There is little realistic opportunity for the arrestee to get objective advice or consider other options. We conclude these circumstances create a high potential for high pressure sales tactics, invasions of arrestees' privacy and other forms of overreaching by bail agents.

By prohibiting unsolicited contact between an arrestee and a bail agent, section 2079.1 directly advances respondent's substantial interest in protecting

9

arrestees from invasions of privacy and potentially intimidating, overreaching or fraudulent sales tactics by bail agents. In *Ohralik, supra*, the Supreme Court held similar concerns for the protection of vulnerable accident victims justified a ban on in-person solicitation by lawyers. The same reasoning applies here. We conclude that section 2079.1 is justified as a prophylactic regulation to protect arrestees from the potential harms associated with direct solicitation.

In addition, section 2079.1 directly advances respondent's substantial interest in preserving order and security at jails. The ban on unsolicited contact between bail agents and arrestees prevents bail agents from engaging in disruptive tactics such as responding to the scene of an arrest to offer their services, following recently arrested people to the jail, or loitering at jail intake or visiting areas in a search for clients.

The regulation is sufficiently narrowly tailored to advance these state interests. There is no requirement that respondent adopt the least restrictive means available to advance its interests. It is sufficient if the regulation is reasonably narrowly tailored to achieve the desired objective. (*Florida Bar v. Went for It, Inc., supra*, 515 U.S. at p. 632.) Here, section 2079.1 only prohibits a bail agent from directly soliciting an arrestee who has not first contacted the bail agent. Bail agents remain free to solicit the family members, friends and attorneys of arrestees. In addition, there is no prohibition against print advertisements in telephone books, to which arrestees routinely have access, or advertisements in other forms of media such as radio, television or web sites. Bail agents may also distribute flyers, business cards, pens or other items displaying their contact information. Because there are "ample alternative channels for receipt of information" about bail agents, we conclude section 2079.1 represents a reasonably narrow intrusion on bail agents' access to potential clients. (*Id.* at p. 634.)

*Pruett v. Harris County Bail Bond Bd.* (5th Cir. 2007) 499 F.3d 403, is not to the contrary. There, the Fifth Circuit considered a Texas statute that allowed

10

county bail boards to prohibit a bail agent from " 'unsolicited contact . . . in person or by telephone to solicit bonding business: [¶] (A) that occurs between the hours of 9 p.m. and 9 a.m.; or [¶] (B) within 24 hours after' " an individual's arrest. (*Id.* at pp. 407-408, quoting Tex. Occ. Code, § 1704.109 (2003).) The 24-hour waiting period applied to all unsolicited contact, whether it involved the arrestee or his or her family members, friends or attorney. A bail agent challenged Harris County's local rule on First Amendment grounds. The county contended both the 24-hour waiting period and the nighttime solicitation ban were required to protect against harassment by bail agents. The Fifth Circuit agreed with respect to the nighttime solicitation ban, but found the 24-hour waiting period violated the First Amendment.

With regard to the nighttime ban, the Fifth Circuit concluded it "directly and substantially furthers privacy and the prevention of harassing solicitation, and is narrowly tailored to furthering that goal." (*Id.* at pp. 415-416.) The 24-hour waiting period, however, did not directly advance the state's interest in privacy protection. (*Id.* at p. 414.) Although citizen complaints regarding harassing conduct by bail agents declined after the rule went into effect, the county could not "connect the reduction in citizen complaints to the 24-hour rule, as opposed to . . . the nighttime solicitation ban . . . ." (*Id.* at pp. 414-415.)[4]

*Pruett* does not control the result here because the Texas rule differs materially from section 2079.1. The Texas rule applied to all unsolicited contact within the first 24 hours after an individual's arrest, including contact with the arrestee's friends and family members. Section 2079.1 is more limited in its scope because it applies only to arrestees. Bail agents remain free to contact interested persons other than the arrestee.

Appellant complains the evidentiary record here does not contain facts supporting respondent's asserted justifications for the regulation. There is no evidence,

---

[4] In a companion case, the Texas Supreme Court reached the same conclusions. (*Pruett v. Harris County Bail Bond Bd.* (Tex. 2008) 249 S.W.3d 447.)

appellant contends, that bail agents will engage in the disruptive or unethical conduct described by respondent without the coercive force of section 2079.1. Respondent was not, however, required to develop a detailed evidentiary record in support of the regulation. Section 2079.1 is a "prophylactic measure[] whose objective is the prevention of harm before it occurs." (*Ohralik v. Ohio State Bar Assn., supra,* 436 U.S. at p. 464.) Respondent was not required to develop evidence of "actual proven harm to the solicited individual" where, as here, solicitation would occur under circumstances that are "inherently conducive to overreaching and other forms of misconduct[.]" (*Id.* at p. 464.) The Supreme Court's commercial speech jurisprudence does not "require that empirical data come to us accompanied by a surfeit of background information. Indeed, in other First Amendment contexts, we have permitted litigants to justify speech restrictions by reference to studies and anecdotes pertaining to different locales altogether [citations] or even, in a case applying strict scrutiny, to justify restrictions based solely on history, consensus and 'simple common sense[.]' " (*Florida Bar v. Went for It, Inc., supra,* 515 U.S. at p. 628.)

Direct solicitation of an arrestee by a bail agent poses the same "dangers of undue influence and overreaching that exist when a lawyer chases an ambulance . . . ." (*Tennessee Secondary School Athletic Assn. v. Brentwood Academy* (2007) 551 U.S. 291, 298.) No "empirical data" is required to credit respondent's "commonsense conclusion" that hard sell tactics directed at arrestees by bail agents could result in invasions of privacy, intimidation, and other forms of overreaching, and could also encourage conduct by bail agents that interferes with the orderly administration of jails and other detention facilities. (*Id.* at p. 300.)

As appellant points out, respondent introduced no evidence in the trial court of disruptive or unethical conduct by specific bail agents in California. Respondent's contention that direct solicitation will lead to such conduct is, however, bolstered by a recent opinion in which the Ohio Court of Appeals described the "coercive and disruptive nature of [bail] solicitation in courthouses and detention

12

facilities[]" in Ohio before that state banned direct bail solicitation. (*In re Henneke* (Ohio App. 2012) 2012 WL 764888 at ¶ 24 [2012-Ohio-996].) A municipal court judge testified that bail bondsmen disrupted arraignments and other proceedings because they refused to stop soliciting while court was in session. (*Id.* at ¶ 25.) An investigator from the Ohio Department of Insurance testified that "he observed 'rowdiness [and] fighting' in court hallways, which interfered with court business." (*Id.* at ¶ 26.) A bondsman testified people waiting for their arraignments were solicited multiple times by bondsmen and that physical altercations occasionally broke out between competing bondsmen and between bondsmen and potential clients. (*Id.*) In addition, "competition amongst bondsmen on court grounds added to citizens' anxiety and vulnerability. For example, [one bondsman] once witnessed a citizen crying after being approached by several bondsmen who were offering competing bids. Thus, the statute provides an important buffer between citizens and bail agents by allowing individuals to exit the courtroom, collect themselves, and depart courthouse or detention center grounds before engaging the services of a bail bondsman." (*Id.* at ¶ 27.)

Ohio bail bondsmen are not uniquely competitive or boisterous. Common sense tells us that the same disruptive, intimidating and intrusive conduct would eventually occur in California, were direct solicitation permitted. Ohio's experience supports our conclusion that Section 2079.1 serves respondent's interests in protecting arrestees and jail staff from the negative consequences of bail solicitation.

*Conclusion*

Section 2079.1 is narrowly tailored to serve respondent's substantial interest in protecting arrestees against harassment, intimidation, fraud and overreaching, and in protecting the orderly administration of jail facilities. As a consequence, enforcement of the regulation against appellant did not violate his right to free speech under the First and Fourteenth Amendments to the United States Constitution.

13

The judgment is affirmed.

CERTIFIED FOR PUBLICATION.

                                                                                    YEGAN, J.

We concur:


GILBERT, P.J.


PERREN, J.

14

Michael L Duffy, Judge

Superior Court County of San Luis Obispo

_____

Jeffrey R. Stein, Jeffrey C. Radding and Neil S. Tardiff, for Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Linda C. Johnson, Supervising Deputy Attorney General, Blythe J. Leszkay, Deputy Attorney General, for Plaintiff and Respondent.