Filed 12/30/20

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>　　Plaintiff and Respondent,<br><br>　　v.<br><br>MONICA MARIE MARTINEZ,<br><br>　　Defendant and Appellant. | H046164<br>(Santa Clara County<br>Super. Ct. No. C1518585) |

Defendant Monica Marie Martinez (also known as Monica Marie Milla) challenges her conviction under Insurance Code section 1814 for violating California Code of Regulations, title 10, section 2076[1] on the ground that section 2076 is constitutionally invalid on its face. Section 2076 prohibits bail licensees from entering, indirectly or directly, any arrangement or understanding with specified types of people—including a "person incarcerated in a jail"—"or with any other persons" to inform or notify any bail licensee, directly or indirectly, of information pertaining to (1) an existing criminal complaint, (2) a prior, impending, or contemplated arrest, or (3) the persons involved therein, which impliedly includes arrestees and named criminal defendants. (See §§ 2054.1 [defining "bail licensee"]; 2054.5 ["arrestee" defined as "any person actually detained or subject to detention in custody whose release may lawfully be effected by bail"].) Insurance Code section 1814 criminalizes any violation of the rules promulgated by the Insurance Commissioner, including section 2076.

---

[1] All further section references are to the California Code of Regulations, title 10, unless otherwise specified.

1

Defendant's conviction under Insurance Code section 1814 for violating section 2076 was by plea, and she obtained a certificate of probable cause. (See Pen. Code, § 1237.5; see also Cal. Rules of Court, rule 8.304(b).) On appeal, defendant challenges the facial validity of the regulation under which she was convicted, asserting that it was constitutionally invalid on its face under several theories. She argues that (1) section 2076 is unconstitutionally vague on its face; (2) the section is a content-based regulation, which unduly suppresses protected speech and is facially invalid under the First Amendment's "strict scrutiny" level of review; and (3) it is unconstitutionally overbroad on its face under the First Amendment overbreadth doctrine. She does not raise an "as applied" challenge.

We find that section 2076 is not unconstitutionally vague on its face. We further conclude that the section, which we determine is content-based and regulates protected speech, fails to survive even an intermediate level of judicial scrutiny. Therefore, it is facially invalid. Given our conclusion, we find it unnecessary to reach defendant's First Amendment overbreadth claim.

Since section 2076 is facially unconstitutional, defendant's judgment of conviction must be reversed.

I

*Procedural History*

A felony complaint, filed August 25, 2015, alleged that on seven different dates in 2014, defendant committed a felony under Insurance Code section 1814 by entering into an agreement and having an understanding with a person incarcerated in jail, to inform and notify defendant, a bail licensee, of the fact of an arrest in violation of section 2076.

Defendant and Jose Luna, who was charged in a different case—both of whom were associated with Luna Bail Bonds—demurred to their complaints on multiple grounds, including that (1) the complaint failed to state facts that constituted a public offense and (2) Insurance Code section 1814, in combination with section 2076, facially

2

violated the constitutional principles of separation of powers of state government,[2] freedom of speech, and due process. In support of the demurrer, they argued, among other things, that those provisions were together unconstitutionally vague and overbroad on their faces in violation of due process rights under the Fourteenth Amendment and article I, section 7 of the California Constitution.[3] They also argued that section 2076 interfered with bail licensees' commercial speech and non-licensees' speech, which was protected by the First Amendment and the California Constitution.[4] They contended that section 2076 could not survive the level of judicial scrutiny applicable to "commercial speech" under the test established by *Central Hudson Gas & Elec. Corp. v. Public Service Commission of New York* (1980) 447 U.S. 557 (*Central Hudson*) because the section was not narrowly tailored to achieve a substantial state interest. They asserted that section 2076 was distinguishable from section 2079.1, the regulation at issue in *People v. Dolezal* (2013) 221 Cal.App.4th 167 (*Dolezal*).

A hearing was held on the demurrer on August 23, 2016. The parties' discussion included, among other things, whether section 2076 was unconstitutionally vague and whether a defendant could complain about vagueness when the defendant's conduct was clearly proscribed. The parties did not discuss whether section 2076 was unconstitutionally overbroad or failed to pass the appropriate level of judicial scrutiny. At the end of the hearing, the trial court stated that it would be preparing a written order.

---

[2] California Constitution, article III, section 3, states: "The powers of state government are legislative, executive, and judicial. Persons charged with the exercise of one power may not exercise either of the others except as permitted by this Constitution."

[3] California Constitution, article I, section 7, subdivision (a), provides in pertinent part: "A person may not be deprived of life, liberty, or property without due process of law . . . ."

[4] California Constitution, article I, section 2, subdivision (a), states: "Every person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right. A law may not restrain or abridge liberty of speech or press."

3

The court set the next court date for September 20, 2016 and impliedly submitted the matter.

On September 20, 2016, the trial court orally overruled the demurrer. The court indicated that a written order would be forthcoming. The clerk's transcript does not contain such a written order. Neither party suggests that such an order exists.

Defendant signed and initialed an "ADVISEMENT OF RIGHTS, WAIVER, AND PLEA FORM" for a felony, indicating that she was pleading no contest to one count of violating Insurance Code section 1814 pursuant to a negotiated plea agreement. On June 26, 2017, defendant pleaded no contest to count 1 only. (See Pen. Code, § 1016, subd. 3.) The plea was conditioned on four months in county jail, with eligibility for all programs except the EMP (electronic monitoring program); submission of the remaining counts for dismissal at the time of sentencing, which was scheduled for January 26, 2018; and the "grant [of] a [s]ection 17 in one year."[5] The trial court indicated that it would issue a certificate of probable cause because it believed that there was a credible issue as to whether a violation of Insurance Code section 1814 for failing to comply with section 2076 constituted a public offense.

On May 18, 2018, the trial court placed defendant on formal probation for three years, ordered her to serve 120 days—to be served by working every Saturday and Sunday until completed—and ordered her to begin serving the term on August 4, 2018.

Defendant filed a notice of appeal. The notice indicated that defendant was challenging the "denial" of a demurrer. The trial court granted defendant's request for a certificate of probable cause.

---

[5] Penal Code section 17, subdivision (b), states in part: "When a crime is punishable, in the discretion of the court, either by imprisonment in the state prison or imprisonment in a county jail under the provisions of subdivision (h) of Section 1170, or by fine or imprisonment in the county jail, it is a misdemeanor for all purposes under the following circumstances: [¶] . . . [¶] (3) When the court grants probation to a defendant and at the time of granting probation, or on application of the defendant or probation officer thereafter, the court declares the offense to be a misdemeanor."

4

II

*Discussion*

A. *Regulation of Bail Licensees*

Under Insurance Code section 1800, subdivision (a), "[a] person shall not in this state solicit or negotiate in respect to execution or delivery of an undertaking of bail or bail bond by an insurer, or execute or deliver such an undertaking of bail or bail bond unless licensed as provided in this chapter."[6]  California's Insurance Commissioner is statutorily authorized to "make reasonable rules necessary, advisable, or convenient for the administration and enforcement of the provisions of [the] chapter [governing bail licenses]."  (Ins. Code, § 1812; see *id*., §§ 20, 1800 et seq.].)  Under Insurance Code section 1814, a bail licensee's "violation . . . of any rule of the [California Insurance Commissioner] . . . is a public offense, punishable by fine not exceeding ten thousand dollars ($10,000), or by imprisonment pursuant to subdivision (h) of Section 1170 of the Penal Code, or in the county jail not exceeding one year, or by both that fine and imprisonment."  (See Ins. Code, § 20.)

The California Insurance Commissioner has issued regulations governing the conduct of bail licensees, which include the following prohibitions.  "No bail licensee shall *directly or indirectly* permit any person on his behalf to solicit or negotiate undertakings of bail or bail bonds or to effect undertakings of bail or to issue or deliver bail bonds *unless such person is properly licensed* by the commissioner to perform such acts, even though such person acts in a purely mechanical or ministerial manner or renders his services gratuitously."  (§ 2068, italics added.)  "Except as provided in

_____

[6] For purposes of Insurance Code section 1800, the term "solicit" includes "any written or printed presentation or advertising made by mail or other publication, or any oral presentation or advertising by means of telephone, radio, or television which implies that an individual is licensed under this chapter, and any activity in arranging for bail which results in remuneration to the individual conducting that activity."  (Ins. Code, § 1800, subd. (b).)

[s]ections 2079 and 2079.1, no bail licensee shall solicit any person for bail in any prison, jail, or other place of detention of persons, court or public institution connected with the administration of justice; or in the halls or corridors adjacent thereto; provided that a bail licensee may in such halls, corridors or in other rooms or areas where not prohibited by local rule or ordinance transact bail with persons specified in [s]ection 2079 who have prior to transaction, *requested his services*." (§ 2074, italics added.)

Section 2079 specifies: "No bail licensee shall solicit bail except in accordance with [s]ection 2079.1 and from: [¶] (a) An arrestee; [¶] (b) The arrestee's attorney; [¶] (c) An adult member of the arrestee's immediate family; or [¶] (d) Such other person as the arrestee shall specifically designate in writing. Such designation shall be signed by the arrestee *before the solicitation*, unless prohibited by the rules, regulations or ordinances governing the place of imprisonment. If so prohibited, it may be signed after release of the arrested to ratify a previous oral designation made by him." (§ 2079, italics added.)

Section 2079.1 states: "Any solicitation of *an arrestee himself* pursuant to Section 2079 (a) shall be only *after a bona fide request for bail services* has been received from the arrestee or from a person specified in Section 2079 (b) [(arrestee's attorney)] or (c) [(adult member of the arrestee's immediate family)]. Any solicitation of a person specified in Section 2079 (c) or (d) shall be only between the hours of 7 o'clock a.m., and 11 o'clock p.m., unless the bail licensee is *directly and specifically authorized in writing* by the arrestee or the arrestee's attorney to make such solicitation at some other specific time." (Italics added.)

Section 2080 establishes: "No bail licensee shall negotiate concerning bail, except with: [¶] (a) A person specified in Section 2079; [¶] (b) Any other person who *without previous solicitation* on the part of the bail licensee has requested his services." (Italics added.)

Section 2076, which is the regulation at issue in this case, provides: "No bail licensee shall, for any purpose, directly or indirectly, enter into an arrangement of any kind or have any understanding with a law enforcement officer, newspaper employee, messenger service or any of its employees, a trusty in a jail, any other person incarcerated in a jail, or *with any other persons*, to inform or notify any licensee (except in direct answer to a question relating to the public records concerning a specific person named by the licensees in the request for information), directly or indirectly, of: [¶] (a) The existence of a criminal complaint; [¶] (b) The fact of an arrest; or [¶] (c) The fact that an arrest of any person is impending or contemplated. [¶] (d) Any information pertaining to the matters set forth in (a) to (c) hereof or the persons involved therein." (Italics added.)

The regulations also prohibit gifts: "No bail licensee shall give, directly or indirectly, any gift of any kind to any public official or employee of any governmental agency who has duties, functions or responsibilities in respect to the administration of justice or a place wherein detention of persons charged with crime may occur, or to a prisoner in any jail or place of detention."[7] (§ 2078.)

B. *Challenge to Trial Court's Order Overruling Demurrer*

As relevant here, a "defendant may demur to the accusatory pleading at any time prior to the entry of a plea, when it appears upon the face thereof either: [¶] 1. . . . the court has no jurisdiction of the offense charged [in an information or complaint]; [¶] . . . [¶] 4. That the facts stated do not constitute a public offense; [¶] 5. That it contains matter which, if true, would constitute a legal justification or excuse of the offense charged, or other legal bar to the prosecution." (Pen. Code, § 1004.) "[A] demurrer lies only to challenge the sufficiency of the pleading. It is limited to those

---

[7] "Items of nominal value which are distributed generally for the purpose of advertising shall not be considered gifts . . . , except if given to prisoners or persons directly in charge of prisoners in their place of detention." (§ 2078.)

defects appearing on the face of the accusatory pleading, and raises only issues of law. (Pen. Code, § 1004; *Tobe v. City of Santa Ana* (1995) 9 Cal.4th 1069, 1090.)" (*People v. Biane* (2013) 58 Cal.4th 381, 388 (*Biane*).)

The California Supreme Court has assumed that "if a statute under which a defendant is charged with a crime is invalid, the complaint is subject to demurrer under subdivisions 1, 4 and 5 of Penal Code section 1004 on the ground that the court lacks jurisdiction because the statute is invalid, the facts stated do not constitute a public offense, and the complaint contains matter which constitutes a legal bar to the prosecution. [Citations.]" (*Tobe v. City of Santa Ana*, *supra*, 9 Cal.4th at p. 1091, fn. 10 (*Tobe*).)

"The legal grounds for demurrer to an accusatory pleading are limited to those specifically enumerated in Penal Code section 1004. [Citations.] Failure to assert one of the enumerated grounds, other than an objection to the jurisdiction of the court or that the facts stated do not constitute a public offense, 'shall be deemed a waiver thereof.' (Pen. Code, § 1012.)" (*Biane*, *supra*, 58 Cal.4th at p. 388.)

An order overruling a defendant's demurrer is not appealable. (See Pen. Code, § 1237, subd. (a); see also *People v. Corenevsky* (1954) 124 Cal.App.2d 19, 25.) However, we may review on appeal whether section 2076 is constitutionally invalid on its face. (See Pen. Code, § 1237, subd. (a), 1237.5; cf. Pen. Code, § 960 ["No accusatory pleading is insufficient, nor can the trial, judgment, or other proceeding thereon be affected by reason of any defect or imperfection in matter of form which does not prejudice a substantial right of the defendant upon the merits."].)

C. *Section 2076 is Not Unconstitutionally Vague on Its Face*

Defendant asserts that section 2076 is unconstitutionally vague on its face. "[T]he underpinning of a vagueness challenge is the due process concept of 'fair warning.' [Citation.] The rule of fair warning consists of 'the due process concepts of preventing arbitrary law enforcement and providing adequate notice to potential offenders'

8

[citation], protections that are 'embodied in the due process clauses of the federal and California Constitutions. (U.S. Const., Amends. V, XIV; Cal. Const., art. I, § 7).' [Citation.]" (*In re Sheena K.* (2007) 40 Cal.4th 875, 890; see *Grayned v. City of Rockford* (1972) 408 U.S. 104, 108-109.)

"A conviction fails to comport with due process if the statute under which it is obtained fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement. [Citations.]" (*United States v. Williams* (2008) 553 U.S. 285, 304 (*Williams*).) "[A] law that is 'void for vagueness' not only fails to provide adequate notice to those who must observe its strictures, but also 'impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application.' (*Grayned v. City of Rockford*, *supra*, 408 U.S at pp. 108-109, fn. omitted.)" (*People ex rel. Gallo v. Acuna* (1997) 14 Cal.4th 1090, 1116 (*Acuna*).)

Ordinarily, however, a person "who has received fair warning of the criminality of his own conduct from the statute in question is [not] entitled to attack it because the language would not give similar fair warning with respect to other conduct which might be within its broad and literal ambit. One to whose conduct a statute clearly applies may not successfully challenge it for vagueness." (*Parker v. Levy* (1974) 417 U.S. 733, 756 (*Parker*).) The California Supreme Court has likewise indicated that if a law "clearly applies to a criminal defendant's conduct, the defendant may not challenge it on grounds of vagueness. [Citations.]" (*Tobe*, *supra*, 9 Cal.4th at p. 1095.) Ordinarily, at least outside the First Amendment context, "vagueness challenges to statutes . . . must be examined in the light of the facts of the case at hand. [Citation.]" (*United States v. Mazurie* (1975) 419 U.S. 544, 550; see *Maynard v. Cartwright* (1988) 486 U.S. 356, 361 ["Objections to vagueness under the Due Process Clause . . . may be overcome in any specific case where reasonable persons would know that their conduct is at risk."].)

Nevertheless, laws may be invalidated "under the Due Process Clause of the Fifth or Fourteenth Amendment because they contained no standard whatever by which criminality could be ascertained . . . . [Citations.] In these cases, the criminal provision is vague 'not in the sense that it requires a person to conform his conduct to an imprecise but comprehensible normative standard, but rather in the sense that no standard of conduct is specified at all.' [Citation.]" (*Parker*, *supra*, 417 U.S. at p. 755.) A statute that "proscribe[s] no comprehensible course of conduct at all . . . may not constitutionally be applied to any set of facts. [Citations.]" (*United States v. Powell* (1975) 423 U.S. 87, 92.) "No one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes." (*Lanzetta v. State of N.J.* (1939) 306 U.S. 451, 453.)

While vagueness doctrine is not "an outgrowth . . . of the First Amendment" (*Williams*, *supra*, 553 U.S. at p. 304), greater clarity may be required where a law may affect protected speech. (See *Smith v. Goguen* (1974) 415 U.S. 566, 573 ["[w]here a statute's literal scope, unaided by a narrowing state court interpretation, is capable of reaching expression sheltered by the First Amendment, the [due process doctrine of vagueness] demands a greater degree of specificity than in other contexts. [Fn. omitted.]"]; see also *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.* (1982) 455 U.S. 489, 499 [if "the law interferes with the right of free speech . . . , a more stringent vagueness test should apply"]; see also *Tobe*, *supra*, 9 Cal.4th at p. 1109.)

More recently, the United States Supreme Court has stated: "[E]ven to the extent a heightened vagueness standard applies, a [person] whose speech is clearly proscribed cannot raise a successful vagueness claim under the Due Process Clause of the Fifth Amendment for lack of notice. And he certainly cannot do so based on the speech of others. Such a [person] may have a valid overbreadth claim under the First Amendment, but our precedents make clear that a Fifth Amendment vagueness challenge does not turn on whether a law applies to a substantial amount of protected expression. [Citations.]" (*Holder v. Humanitarian Law Project* (2010) 561 U.S. 1, 20.)

10

Defendant is not claiming that section 2076 failed to provide her with fair warning of the criminality of her own conduct. Further, it appears that her misconduct—"entering into an agreement and having an understanding with a person incarcerated in jail, to inform and notify defendant, a bail licensee, of the fact of an arrest"—was clearly proscribed. Accordingly, her facial vagueness challenge must be rejected.

Moreover, insofar as defendant is arguing that section 2076 is constitutionally invalid on its face due to pervasive vagueness, her claim lacks merit. "[P]erfect clarity and precise guidance have never been required even of regulations that restrict expressive activity. See *Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972) ('Condemned to the use of words, we can never expect mathematical certainty in our language'); see also *Kovacs v. Cooper*, 336 U.S. 77, 79 (1949) (rejecting vagueness challenge to city ordinance forbidding 'loud and raucous' sound amplification) (opinion of Reed, J.)." (*Ward v. Rock Against Racism* (1989) 491 U.S. 781, 794.) "[N]o more than a reasonable degree of certainty can be demanded." (*Acuna*, *supra*, 14 Cal.4th p. 1117.)

Defendant asserts that the words "understanding" and "arrangement" are unconstitutionally vague. Her argument is that "[t]he usual and ordinary meaning of these terms" indicates "an informal agreement of any kind or an informal mutual agreement." She claims that "[t]he problem with the language of the statute then is that it does not prohibit a formal contract, only an informal one" and that it is "not sufficiently precise to inform one of the acts that are proscribed." This argument fails to persuade us.

The word "[u]nderstanding" means "a mutual agreement not formally entered into but in some degree binding on each side." (Merriam-Webster Unabridged Dict. <https://unabridged.merriam-webster.com/unabridged/understanding> [as of Dec. 30, 2020], archived at <http://perma.cc/2HLK-MRYF>.) It has also been defined as "[a]n informal or unspoken agreement or arrangement." (Lexico Online Dict. <https://www.lexico.com/en/definition/understanding> [as of Dec. 30, 2020], archived at <http://perma.cc/3JL8-EGRJ>.) The word "arrangement" means "[a]n agreement with

11

someone." (Lexico Online Dict. <https://www.lexico.com/en/definition/arrangement> [as of Dec. 30, 2020], archived at <http://perma.cc/85CL-6D7V>.) The word "arrangement" has been defined as "a mutual agreement or understanding (as between persons or nations)." (Merriam-Webster Unabridged Dict. <https://unabridged.merriam-webster.com/unabridged/arrangement> [as of Dec. 30, 2020], <http://perma.cc/T3PR-MY99>.)

An agreement can be "a contract duly executed and legally binding on the parties entering into it" or "an arrangement (as between two or more parties) as to a course of action." (Merriam-Webster Unabridged Dict. <https://unabridged.merriam-webster.com/unabridged/agreement> [as of Dec. 30, 2020], archived at <http://perma.cc/T3PRMY00>.) Thus, the words "arrangement" and "understanding" suggest at least mutuality and assent regardless of the degree of informality, and they include a legally binding contract in addition to informal or tacit agreements between persons.[8] We do not agree with defendant that a formal agreement or contract is outside the purview of section 2076's prohibition.

Defendant also asserts that the phrases "for any purpose," "directly or indirectly," and "with any other persons" in section 2076 are vague. They are not. The language makes clear that the section's prohibition extends as broadly as possible to any prohibited arrangement or understanding, regardless of the identity of the other party, regardless of the purpose, and regardless whether it is entered or carried out through intermediaries. Contrary to defendant's assertion, the breadth of the prohibition and its inclusivity do not render it vague.

The practical difficulties of proving an informal agreement or tacit understanding to inform or notify a bail licensee of information pertaining to an arrest, criminal complaint, or "persons involved therein" do not mean that section 2076 is

---

[8] "An agreement is a manifestation of mutual assent on the part of two or more persons." (Rest.2d Contracts, § 3.)

unconstitutionally vague on its face. It is erroneous to believe that "the mere fact that close cases can be envisioned renders a statute vague." (*Williams*, *supra*, 553 U.S. at p. 305.) "What renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is." (*Id*. at p. 306.) The problem of close cases is "addressed, not by the doctrine of vagueness, but by the requirement of proof beyond a reasonable doubt. [Citation.]" (*Ibid*.)

Defendant further argues that "the phrase 'or any other persons' is unconstitutionally vague since the plain language severely restricts a bail licensee's right to freedom of expression and association." She also contends that the regulation's language, which includes the phrase "for any purpose," "prohibit[s] a tremendous amount of conduct and speech." These arguments do not demonstrate unconstitutional vagueness. They may relate to whether section 2076 is narrowly tailored or unconstitutionally overbroad. " 'A clear and precise enactment may nevertheless be "overbroad" if in its reach it prohibits constitutionally protected conduct.' (*Grayned v. City of Rockford* (1972) 408 U.S. 104, 114, fn. omitted.)" (*Acuna*, *supra*, 14 Cal.4th at p. 1115.)

We reject defendant's contention that section 2076 is facially invalid because it is unconstitutionally vague.

D. Section *2076 is Facially Unconstitutional under Scrutiny Analysis*

1. *Introduction*

The parties agree that section 2076 regulates speech, but they disagree as to the appropriate level of judicial scrutiny and whether the section survives such scrutiny. A law that restricts speech may be constitutionally invalid on its face if it fails to pass the requisite judicial scrutiny. (See, e.g., *Brown v. Entertainment Merchants Ass'n* (2011) 564 U.S. 786, 799-800 [state restrictions on violent video games failed to pass strict scrutiny]; *R.A.V. v. St. Paul* (1992) 505 U.S. 377, 391-396 [city's bias-motivated

13

disorderly conduct ordinance, under which a juvenile had been charged for cross-burning, was "facially unconstitutional" and its content discrimination was not reasonably necessary to achieve city's compelling interests]; *Metromedia, Inc. v. City of San Diego* (1981) 453 U.S. 490, 512 (plur. opn. of White, J.) [insofar as billboard ordinance regulated commercial speech, it met constitutional requirements], 521 [but billboard ordinance was unconstitutional on its face due to its restrictions on noncommercial speech]; *Central Hudson*, *supra*, 447 U.S. at pp. 570-572 [reversing state judgment upholding state regulation banning promotional advertising by an electrical utility where government did not show that the regulation satisfied the level of scrutiny applicable to commercial speech]; *First Nat. Bank of Boston v. Bellotti* (1978) 435 U.S. 765, 767, 795 [invalidating challenged portion of criminal statute that forbid certain expenditures by banks and business corporations to influence the vote on referendum proposals because it "prohibit[ed] protected speech in a manner unjustified by a compelling state interest"].)

2. *Intermediate Level of Scrutiny that Applies to Commercial Speech*

The People argue that we should use the less rigorous, intermediate level of scrutiny that applies to commercial speech in evaluating the facial validity of section 2076.[9]

In the seminal case of *Central Hudson*, the Supreme Court stated that "[t]he First Amendment, as applied to the States through the Fourteenth Amendment, protects

---

[9] A less rigorous standard of review has been also applied to time, place, or manner restrictions. "[E]ven in a public forum the government may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions 'are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information.' [Citations.]" (*Ward v. Rock Against Racism*, *supra*, 491 U.S. at p. 791.) "[A] regulation of the time, place, or manner of protected speech must be narrowly tailored to serve the government's legitimate, content-neutral interests[,] but . . . it need not be the least restrictive or least intrusive means of doing so." (*Id*. at p. 798, fn. omitted.) Content-neutral time, place or manner restrictions on speech or expressive conduct are not at issue here.

14

commercial speech from unwarranted governmental regulation. [Citation.]" (*Central Hudson*, *supra*, 447 U.S. 561.) But the court agreed that the United States Constitution "accords a lesser protection to commercial speech than to other constitutionally guaranteed expression. [Citation.]" (*Id*. at p. 563.) In addition, the court made clear that commercial speech that was "more likely to deceive the public than to inform it" or that "related to illegal activity" received no protection under the First Amendment, and the government could ban such unprotected speech. (*Id*. at pp. 563-564.)

The United States Supreme Court has explained that "the government's legitimate interest in protecting consumers from 'commercial harms' explains 'why commercial speech can be subject to greater governmental regulation than noncommercial speech.' [Citations.]" (*Sorrell v. IMS Health Inc.* (2011) 564 U.S. 552, 579 (*Sorrell*).) For example, " 'a State may choose to regulate price advertising in one industry but not in others, because the risk of fraud . . . is in its view greater there.' [Citation.]" (*Id*. at p. 579.)

In *Central Hudson*, the Supreme Court established a framework, "a four-part analysis," for analyzing restrictions on commercial speech.[10] (*Central Hudson*, *supra*, 447 U.S. at 566.) The Supreme Court stated: "At the outset, we must determine whether the expression is protected by the First Amendment. For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading.

---

[10] There has been criticism of the *Central Hudson* analysis. (See, e.g., *Lorillard Tobacco Co. v. Reilly* (2001) 533 U.S. 525, 554-555; *Greater New Orleans Broadcasting Ass'n, Inc. v. United States* (1999) 527 U.S. 173, 184; *44 Liquormart, Inc. v. Rhode Island* (1996) 517 U.S. 484, 517 (*Liquormart*) (conc. opn. of Scalia, J.) [the *Central Hudson* test "seems to me to have nothing more than policy intuition to support it"]; 522 (conc. opn. of Thomas, J.) ["I do not see a philosophical or historical basis for asserting that 'commercial' speech is of 'lower value' than 'noncommercial' speech."].) But the intermediate level of scrutiny for commercial speech has not been repudiated. As a state court, we are bound by the decisions of the United States Supreme Court on questions of federal constitutional law under the Supremacy Clause of the United States Constitution. (See *People v. Fletcher* (1996) 13 Cal.4th 451, 469, fn. 6.)

15

Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation *directly advances* the governmental interest asserted, and whether it is *not more extensive than is necessary* to serve that interest." (*Ibid.*, italics added; see *id*. at p. 564 ["if the governmental interest could be served as well by a more limited restriction on commercial speech, the excessive restrictions cannot survive."].)

Under this mid-level scrutiny, "[t]he regulatory technique may extend only as far as the interest it serves." (*Central Hudson*, *supra*, 447 U.S. at p. 565.) However, the fit between the Legislature's ends and the means chosen to accomplish those ends is not required to be perfect. (*Board of Trustees of State University of New York v. Fox* (1989) 492 U.S. 469, 480.) The means employed need not be the "single best disposition" or "the least restrictive means" so long as the means are "narrowly tailored to achieve the desired objective." (*Ibid.*; see *Florida Bar v. Went For It, Inc.* (1995) 515 U.S. 618, 632 (*Went For It*) ["the 'least restrictive means' test has no role in the commercial speech context. [Citation.]"].)

3. *Strict Scrutiny*

In contrast, defendant urges us to apply strict scrutiny to section 2076. She asserts that since section 2076 "seeks to regulate speech based on its content," the strict scrutiny standard applies. She argues that even if the state has "a compelling interest, the regulation is not even remotely sufficiently narrowly tailored to achieve that goal."

In recent years, the United States Supreme Court has stressed that content-based restrictions on speech are subject to strict scrutiny. The court has stated that its "precedents distinguish between content-based and content-neutral regulations of speech." (*National Institute of Family and Life Advocates v. Becerra* (2018) ___ U.S. ___, ___ [138 S.Ct. 2361, 2371] (*Becerra*).) The court explained: "Content-based regulations 'target speech based on its communicative content.' *Reed v. Town of Gilbert*, 576 U.S. [155, 163], 135 S.Ct. 2218, 2226 (2015). As a general matter, such laws 'are

16

presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests.' *Ibid*. This stringent standard reflects the fundamental principle that governments have ' "no power to restrict expression because of its message, its ideas, its subject matter, or its content." ' *Ibid*." (*Ibid*.)

In *Reed v. Town of Gilbert, Ariz.*, *supra*, 576 U.S. 155 (*Reed*), the court explained that "strict scrutiny applies either when a law is content based on its face or when the purpose and justification for the law are content based." (*Id*. at p. 166.) "A law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of 'animus toward the ideas contained' in the regulated speech. [Citation.]" (*Id*. at p. 165.) In *Hill v. Colorado* (2000) 530 U.S. 703, the United States Supreme Court made clear that "[r]egulation of the subject matter of messages, though not as obnoxious as viewpoint-based regulation, is also an objectionable form of content-based regulation. [Citation.]" (*Id*. at p. 723.)

Accordingly, "[t]he Government may . . . regulate the content of constitutionally protected speech in order to promote a compelling interest if it chooses the least restrictive means to further the articulated interest." (*Sable Communications of California, Inc. v. F.C.C.* (1989) 492 U.S. 115, 126 (*Sable*).) "It is not enough to show that the Government's ends are compelling; the means must be carefully tailored to achieve those ends." (*Ibid*.) "If a less restrictive alternative would serve the Government's purpose, the legislature must use that alternative. [Citations.] To do otherwise would be to restrict speech without an adequate justification, a course the First Amendment does not permit." (*United States v. Playboy Entertainment Group, Inc.* (2000) 529 U.S. 803, 813.)

"When plaintiffs challenge a content-based speech restriction, *the burden is on the Government* to prove that the proposed alternatives will not be as effective as the challenged statute. [Citation.]" (*Ashcroft v. American Civil Liberties Union* (2004) 542

17

U.S. 656, 665, italics added.) "The purpose of the [least restrictive alternative] test is to ensure that speech is restricted no further than necessary to achieve the goal, for it is important to ensure that legitimate speech is not chilled or punished. . . . [T]he court should ask whether the challenged regulation is the least restrictive means among available, effective alternatives." (*Id*. at p. 666.)

4. *Section 2076 is a Content-Based Regulation*

The People maintain that section 2076 is not a content-based regulation but rather a content-neutral regulation of the conduct of bail licensees.

" '[T]he First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech,' *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011), and professionals are no exception to this rule [citation]. . . . While drawing the line between speech and conduct can be difficult, this Court's precedents have long drawn it [citations]." (*Becerra*, *supra*, ___U.S. at p. ___ [138 S.Ct. at p. 2373].) The First Amendment's incidental burden doctrine "is why a ban on race-based hiring may require employers to remove ' "White Applicants Only" ' signs, *Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 47, 62 (2006); why 'an ordinance against outdoor fires' might forbid 'burning a flag,' [*R.A.V. v. St. Paul* (1992) 505 U.S. 377,] 385; and why antitrust laws can prohibit 'agreements in restraint of trade,' *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949)."[11] (*Sorrell*, *supra*, 564 U.S. at p. 567.)

---

[11] "A content-neutral regulation will be sustained under the First Amendment if it advances important governmental interests unrelated to the suppression of free speech and does not burden substantially more speech than necessary to further those interests [Citation.]" (*Turner Broadcasting System, Inc. v. F.C.C.* (1997) 520 U.S. 180, 189; see *United States v. O'Brien* (1968) 391 U.S. 367, 376 ["when 'speech' and 'nonspeech' elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms"].)

18

"[A] facially neutral law does not become content based simply because it may disproportionately affect speech on certain topics. On the contrary, '[a] regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others.' [Citation.]" (*McCullen v. Coakley* (2014) 573 U.S. 464, 480.)

However, section 2076 must be regarded as a content-based regulation on its face because it targets a bail licensee's arrangement or understanding with another to pass specified information to any bail licensee. (See *Sorrell*, *supra*, 564 U.S. at p. 570 ["the creation and dissemination of information are speech within the meaning of the First Amendment"].) Our conclusion that section 2076 is a content-based regulation does not, however, automatically make the section subject to strict scrutiny.

Long before *Reed*, the Supreme Court stated that "[i]f commercial speech is to be distinguished, it 'must be distinguished *by its content*.' [Citation.]" (*Bates v. State Bar of Arizona* (1977) 433 U.S. 350, 363, italics added; see *R.A.V. v. City of St. Paul, Minn.* (1992) 505 U.S. 377, 423, fn. 4 (conc. opn. of Stevens, J.) [U.S. Supreme Court has "long upheld regulations of commercial speech based on subject matter"].) In *Central Hudson*, the Supreme Court explained: "In most other contexts, the First Amendment prohibits regulation based on the content of the message. [Citation.] Two features of commercial speech permit regulation of its content. First, commercial speakers have extensive knowledge of both the market and their products. Thus, they are well situated to evaluate the accuracy of their messages and the lawfulness of the underlying activity. [Citation.] In addition, commercial speech, the offspring of economic self-interest, is a hardy breed of expression that is not 'particularly susceptible to being crushed by overbroad regulation.' [Citation.]" (*Central Hudson*, *supra*, 447 U.S. at p. 564, fn. 6.)

Defendant cites *Sable*, *supra*, 492 U.S. 115 for the proposition that a regulation that "regulates speech based on its content must be narrowly tailored to promote a compelling government interest." The provision of the Communications Act of 1934 at

issue in *Sable* (former 47 U.S.C. § 223(b)) "impose[d] an outright ban on indecent as well as obscene interstate commercial telephone messages." (*Sable*, *supra*, 492 U.S. at p. 117.) The United States Supreme Court stated: "The Government may . . . regulate the content of constitutionally protected speech in order to promote a compelling interest if it chooses the least restrictive means to further the articulated interest." (*Id*. at p. 126.) The court agreed that "while the Government has a legitimate interest in protecting children from exposure to indecent dial-a-porn messages, [the challenged provision] was not sufficiently narrowly drawn to serve that purpose and thus violated the First Amendment." (*Ibid*.; see *id*. at pp. 128 [court observed that the FCC had "determined that its credit card, access code, and scrambling rules were a satisfactory solution to the problem of keeping indecent dial-a-porn messages out of the reach of minors."]; 130 ["For all we know from this record, the FCC's technological approach to restricting dial-a-porn messages to adults who seek them would be extremely effective, and only a few of the most enterprising and disobedient young people would manage to secure access to such messages. (Fn. omitted.)"].)

Sable did not, however, characterize the challenged dial-a-porn provision as a restriction on "commercial speech," as that term has been defined by the United States Supreme Court. Neither did the court repudiate the *Central Hudson* analysis that has been applied to commercial speech.

5. *Defendant's Claim that Section 2076 Regulates Noncommercial Speech*

Although a basic question is whether section 2076, as we have construed it, regulates noncommercial speech, the answer is not clear. "[T]he precise bounds of the category of expression that may be termed commercial speech" are uncertain. (*Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio* (1985) 471 U.S. 626, 637

(*Zauderer*); see *Edenfield v. Fane* (1993) 507 U.S. 761, 765 (*Edenfield*) ["ambiguities may exist at the margins of the category of commercial speech"].)

Without a doubt, "advertising pure and simple . . . falls within th[e] bounds [of commercial speech]." (*Zauderer*, *supra*, 471 U.S. at p. 637.) Similarly, solicitation of potential clients by licensed professionals is clearly commercial speech. (See, e.g., *Went For It, Inc.*, *supra*, 515 U.S. at pp. 620, 635 [state bar rule that barred targeted direct-mail solicitation of accident victims and their relatives for 30 days following an accident or disaster withstood scrutiny under *Central Hudson*]; *Edenfield*, *supra*, 507 U.S. at pp. 767-771 [blanket ban on direct, in-person, uninvited solicitation by certified public accountants determined to be unconstitutional under *Central Hudson*]; *Ohralik v. Ohio State Bar Ass'n* (1978) 436 U.S. 447, 454 (*Ohralik*) [upholding as constitutional the application of state bar disciplinary rules to a lawyer's personal solicitation of accident victims].)

But commercial speech has been described more broadly as "expression related solely to the economic interests of the speaker and its audience" (*Central Hudson*, *supra*, 447 U.S. at p. 561) and as speech proposing a commercial transaction. (*Id*. at p. 562.) The Supreme Court has explained that commercial speech is " 'linked inextricably' with the commercial arrangement that it proposes [citation], so the State's interest in regulating the underlying transaction may give it a concomitant interest in the expression itself. [Citation.]" (*Edenfield*, *supra*, 507 U.S at p. 767.)

Without explanation, the People assume that section 2076, like section 2079.1, regulates commercial speech. Obviously, the provision does not directly regulate quintessential commercial speech, such as advertising or a licensed professional's solicitation of potential clients. However, it might be argued that section 2076 regulates the commercial speech of bail licensees, who are likely to be animated by the profit motive to seek information that can be exploited to conduct bail solicitations—which are undisputedly commercial speech. (See *Liquormart*, *supra*, 517 U.S. at p. 499 [noting that

21

the court had recognized that "the greater 'hardiness' of commercial speech, inspired as it is by the profit motive, likely diminishes the chilling effect that may attend its regulation"].)

Defendant accepts that the speech regulated by section 2079.1—solicitation for bail services—"can only be characterized as commercial speech." But defendant asserts that section 2076 reaches noncommercial speech. She argues that section 2076 restricts "speech by 'any other persons,' not just licensees" and the regulation "prevents [those persons] from notifying a licensee about the existence of a criminal complaint, the fact of an arrest or impending arrest, or 'any information pertaining to [an arrest or impending arrest] or the persons involved therein.' "

Defendant misreads section 2076. The section is aimed at preventing a bail licensee from *entering* an arrangement or understanding with another to have such information channeled to any licensee. Contrary to defendant's assertion, section 2076 does not directly prohibit bail licensees from merely asking "about newsworthy arrests or complaints out of simple curiosity." Section 2076 does not prohibit a bail licensee from receiving information pertaining to a prior or upcoming arrest, an existing criminal complaint, or the persons involved therein, provided the information is not being conveyed pursuant to a prohibited arrangement or understanding. Section 2076 certainly does not, as defendant claims, impose a blanket prohibition that prevents a bail licensee "from asking anyone about anything relating to criminal complaints, arrests, or 'any information pertaining' to them."

Defendant argues that section 2076 might subject to criminal prosecution any licensee who arranges for an employee of the local police department to notify the licensee of the arrest of the licensee's "missing child" or other family member. Under section 2076, a bail licensee remains free to report a missing child to law enforcement and seek updated information on the results of any official search for the child. A bail license can also seek information about an arrested family member through ordinary

channels. Section 2076 explicitly does not affect a bail licensee's ability to make a public records request concerning a specific person and to receive a "direct answer to a question relating to the public records concerning [the] specific person named by the licensees in the request for information."

Defendant also claims that the section could conceivably cover a bail licensee's conversation with "a currently incarcerated defendant" in which the licensee informs the incarcerated defendant that the licensee "cannot post bail for him but that [the licensee] can provide [the defendant] with a list of other bail licensees who might be able to do so." We find this imagined scenario farfetched. In any case, we see nothing in the language of section 2076 that precludes a bail licensee who is lawfully responding to a bona fide request for bail services from merely providing contact information enabling an arrestee to make a separate bona fide request for bail services from other bail licensees. Further, contrary to defendant's suggestion, section 2076 itself does not make it unlawful for a bail licensee to merely ask a bail customer with whom she is permissibly dealing to recommend her to others needing bail services. However, a bail licensee clearly cannot "directly or indirectly permit any person on his [or her] behalf to solicit or negotiate undertakings of bail or bail bonds or to effect undertakings of bail or to issue or deliver bail bonds unless such person is properly licensed . . . to perform such acts . . . ." (§ 2068.) Obviously, "any person" in this context includes a jail inmate.

As to non-licensees, section 2076 does not bar them from answering a bail licensee's question or inquiry or from providing information to a licensee. Neither does the section, in conjunction with Insurance Code section 1814, penalize a non-licensee if she or he does convey information specified by section 2076. Defendant fails to persuade us that section 2076 impacts the free speech rights of non-licensees.

Nevertheless, defendant argues that because section 2076 precludes a bail licensee from entering into a prohibited agreement or understanding regardless of its underlying "purpose," the regulation "goes far beyond commercial speech." We ultimately find it

23

unnecessary to resolve whether section 2076 regulates commercial speech, noncommercial speech, or both because even under the level of scrutiny applicable to commercial speech, the section does not pass constitutional muster.

6. *Section 2076 Does Not Survive Heightened Constitutional Scrutiny*

Common sense tells us that section 2076 restricts or chills bail licensees' speech where such speech evidences, or might be regarded by law enforcement as evidencing, an impermissible arrangement or understanding. Even if we assume for purposes of argument that the speech affected by section 2076 may be properly characterized as only commercial speech, the regulation does not survive judicial scrutiny. "Under a commercial speech inquiry, it is *the State's burden* to justify its content-based law as consistent with the First Amendment. [Citation.]" (*Sorrell*, *supra*, 564 U.S. at pp. 571-572, italics added.)

In this case, the People focus on the nature of the state's interests in regulating bail licensees and their bail solicitations.[12] They suggest that the challenged regulation was promulgated "because the use of insider arrest information by bail agents creates an uneven playing field within the bail industry and promotes a coercive environment for arrestees within the criminal justice system." They identify substantial state interests in (1) regulating bail agents, who are licensed professionals working in the criminal justice system, to ensure " 'they operate in a fair, honest and professional manner[]' "; (2) "protecting 'recent arrestees against harassment, intimidation, overreaching and annoyance or invasions of privacy by bail agents' and by those acting on their behalf"; and (3) " 'protecting the orderly administration of justice.' "

Defendant asserts that "it is impossible to tell from the regulation whether there is a compelling interest at stake." Of course, under the intermediate scrutiny of *Central Hudson*, the People must demonstrate that the regulation serves a substantial state

_____

[12] The People have not suggested that section 2076 restricts commercial speech that is misleading or necessarily concerns unlawful activity.

24

interest, rather than a compelling one. Defendant conjectures that the unspoken goal of the challenged regulation might be "to prevent incarcerated people from being targeted by unscrupulous bail licensees," "to protect free competition among those who are licensed to perform this service," and "to prevent some kind of cottage industry dealing with bail within the jail."

We begin with the basic understanding that "the business of insurance is sufficiently affected with a public interest to justify its regulation by the state [citation] . . . ." (*Boghos v. Certain Underwriters at Lloyd's of London* (2005) 36 Cal.4th 495, 507.) "[T]he conduct of a bail bond business is such a business as is subject to reasonable regulation under the police power of the state. The legislature has properly determined that abuses have arisen or may arise which make it necessary or desirable that there be some public supervision of that business." (*McDonough v. Goodcell* (1939) 13 Cal.2d 741, 746.)

In *Dolezal*, *supra*, 221 Cal.App.4th 167, which is heavily relied upon by the People, the defendant challenged the constitutionality of section 2079.1 after he was convicted for its violation under Insurance Code section 1814. The appellate court in *Dolezal* applied the intermediate standard of scrutiny applicable to commercial speech. (*Dolezal*, *supra*, 221 Cal.App.4th at pp. 172-173.)

The appellate court stated: "Each of the interests identified by respondent has been recognized as substantial in the context of First Amendment challenges to the regulation of commercial speech. In *Edenfield v. Fane* (1993) 507 U.S. 761, the court recognized that Florida had a substantial interest in protecting potential consumers from fraud, overreaching, intimidation, annoyance, harassment or invasions of privacy during direct personal solicitation. (*Id*. at pp. 768-769; see also *Ohralik v. Ohio State Bar Assn* (1978) 436 U.S. 447, 462 ['the State has a legitimate and indeed "compelling" interest in preventing those aspects of solicitation that involve fraud, undue influence, intimidation, overreaching, and other forms of "vexatious conduct." '].) *Edenfield* also acknowledged

25

'the State's important interests in maintaining standards of ethical conduct in the licensed professions.' ([*Edenfield*, *supra*, 507 U.S.] at p. 770; see also *Florida Bar v. Went For It, Inc.*, *supra*, 515 U.S. at p. 625 [state has compelling interest in licensing and regulating the practice of professions].) Finally, the state has a substantial interest in protecting the orderly administration of justice. (*Florida Bar v. Went For It, Inc.*, *supra*, 515 U.S. at p. 624.)" (*Dolezal*, *supra*, 221 Cal.App.4th at p. 174.)

In *Dolezal*, the appellate court also explained: "Most people find being in jail to be a very stressful situation. For many arrestees, a bail agent is the only person who can secure their release. But an arrestee may also lack information about his or her court schedule or custody status and may not be able to fairly evaluate the terms offered by a particular bail agent, to decide whether to contact other agents or to wait until their court appearance to request release without bail. A bail agent who appears unsolicited in the jail visiting area with paperwork ready to be signed could impose pressure on an arrestee to make an immediate decision. There is little realistic opportunity for the arrestee to get objective advice or consider other options." (*Dolezal*, *supra*, 221 Cal.App.4th at pp. 175-176.) The court concluded that those "circumstances create[d] a high potential for high-pressure sales tactics, invasions of arrestees' privacy and other forms of overreaching by bail agents." (*Id.* at p. 176.) The court observed that advertisements for bail could reach arrestees through "print advertisements in telephone books, to which arrestees routinely ha[d] access, or advertisements in other forms of media such as radio, television or Web sites" (*ibid.*) and that bail agents could also "distribute flyers, business cards, pens or other items displaying their contact information." (*Ibid.*)

In *Dolezal*, the appellate court determined that "[b]y prohibiting unsolicited contact between an arrestee and a bail agent, section 2079.1 directly advances [the state's] substantial interest in protecting arrestees from invasions of privacy and potentially intimidating, overreaching or fraudulent sales tactics by bail agents." (*Dolezal*, *supra*, 221 Cal.App.4th at p. 176.) It concluded that section 2079.1 was

26

"justified as a prophylactic regulation to protect arrestees from the potential harms associated with direct solicitation." (*Ibid*.) The court further concluded that "section 2079.1 directly advance[d] [the state's] substantial interest in preserving order and security at jails. The ban on unsolicited contact between bail agents and arrestees prevents bail agents from engaging in disruptive tactics such as responding to the scene of an arrest to offer their services, following recently arrested people to the jail, or loitering at jail intake or visiting areas in a search for clients." (*Ibid*.)

The appellate court in *Dolezal* further explained, "[d]irect solicitation of an arrestee by a bail agent poses the same 'dangers of undue influence and overreaching that exist when a lawyer chases an ambulance . . . .' (*Tennessee Secondary School Athletic Assn. v. Brentwood Academy* (2007) 551 U.S. 291, 298.)" (*Dolezal, supra*, 221 Cal.App.4th at p. 178.) The court found that "[n]o 'empirical data' [was] required to credit [the state's] 'commonsense conclusion' that hard sell tactics directed at arrestees by bail agents could result in invasions of privacy, intimidation, and other forms of overreaching, and could also encourage conduct by bail agents that interferes with the orderly administration of jails and other detention facilities. [Citation.]" (*Ibid*.) The court concluded that "[s]ection 2079.1 [was] narrowly tailored to serve [the state's] substantial interest in protecting arrestees against harassment, intimidation, fraud and overreaching, and in protecting the orderly administration of jail facilities." (*Id*. at p. 179.)

Relatedly, the California Penal Code makes it criminal for a bail licensee to "employ, engage, solicit, pay, or promise any payment, compensation, consideration or thing of value to any person incarcerated in any prison, jail, or other place of detention for the purpose of that person soliciting bail on behalf of the licensee." (Pen. Code, § 160, subd. (a).) Penal Code section 160 explicitly states that "[n]othing in this section shall prohibit prosecution under [s]ection 1800 or 1814 of the Insurance Code, or any other applicable provision of law." (Pen. Code, § 160, subd. (b).)

27

The legislative history underlying the enactment of Penal Code section 160 indicates that the Legislature has been well aware of the long-standing abuses of the bail industry that occur in the solicitation of arrestees. An analysis of Assembly Bill No. 1694 (2003-2004 Reg. Sess.) explained the need for the law: "According to the author, this bill will better prevent unfair, anti-competitive behavior in the bail bond industry by prohibiting bail companies from compensating inmates for soliciting business in jails. The State Department of Insurance regulates the bonds industry to ensure that the industry provides service in the most professional manner. . . . [¶] Unfortunately, the industry reports that the State Department of Insurance has a difficult time enforcing laws and regulations designed to prevent the unfair and anti-competitive practice of providing compensation to inmates for soliciting the business of detained individuals. The practice of providing compensation to inmates for such activities has, in effect, permitted inmates unlicensed by the department to solicit bail services. Inmates do not know, nor should they be expected to know the laws pertaining to bail bonds services[,] and [they] can intimidate detained individuals into calling a particular agent because of the monetary benefit which creates an unfair and anti-competitive business atmosphere. [¶] The anti-competitive situation [arises] when one bail company compensates inmates to solicit business and detained individuals are not free to call other bail companies. Essentially, bail companies abiding by the department's regulations lose business while those ignoring existing regulations obtain all the business. In fact, the bail industry reports that situations arise where one bail company has written nearly every bond at a jail." (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 1694 (2003-2004 Reg. Sess.) as amended June 8, 2004, pp. 2-3.)

The State of California continues to grapple with systemic problems in the bail industry, including improper solicitation of arrestees.[13] We have no doubt that the state

---

[13] On our own motion, we take judicial notice of Insurance Commissioner Dave Jones's Recommendations for California's Bail System (Feb. 2018) (hereafter Bail

has substantial interests in preventing bail licensees from engaging in, directly or indirectly, oppressive and unscrupulous bail solicitation. However, even if section 2076 was intended to serve the ultimate goal of preventing unlawful, predatory solicitation of arrestees, the People falter at step three of the *Central Hudson* test. They have failed to demonstrate that section 2076 provides more than "only ineffective or remote support for the government's purpose." (*Central Hudson*, *supra*, 447 at p. 564.)

"The third step of *Central Hudson* concerns the relationship between the harm that underlies the State's interest and the means identified by the State to advance that interest." (*Lorillard Tobacco Co. v. Reilly* (2001) 533 U.S. 525, 555 (*Lorillard*).) It "asks whether the speech restriction *directly and materially* advances the asserted governmental interest." (*Greater New Orleans Broadcasting Ass'n, Inc. v. U.S.* (1999) 527 U.S. 173, 188 (*Greater New Orleans*), italics added; see *Went For It*, *supra*, 515 U.S. at p. 624.) This "penultimate prong of the *Central Hudson* test requires that a regulation impinging upon commercial expression 'directly advance the state interest involved; the regulation may not be sustained if it provides only ineffective or remote support for the government's purpose.' *Central Hudson Gas & Electric Corp.*, 447 U.S., at 564." (*Edenfield*, *supra*, 507 U.S. at p. 770.)

_____

Recommendations Report or report). (See Evid. Code, §§ 452, subd. (c), 459; see also *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 842, fn. 3) The Bail Recommendations Report found that California needed to improve the oversight and regulation of the bail industry and reform the bail system. Among the many problems recognized by the report were illegal solicitation and the use of jail inmates and jail staff as recruiters for bail transactions. (Bail Recommendations Report, p. 5.) The report indicated that arrests in August of 2015 in Santa Clara County were "the result of a multi-year investigation uncovering schemes by bail agents to scoop business away from competitors by rewarding jail inmates with money added to their jail accounts for providing information about newly booked individuals in the jails." (*Id*. at p. 6.) It noted that "bail consumers" are in a "vulnerable state . . . when they or their family and/or friends are purchasing bail." (*Ibid*.) The report stated that increased "consumer protection" was needed "to safeguard bail consumers." (*Ibid*.) It indicated that "the general population [was] at some risk of being victimized by unscrupulous bail agents." (*Id*. at p. 5.)

Although in *Ohralik*, *supra*, 436 U.S. 447 the Supreme Court upheld as constitutional the application of prophylactic state bar disciplinary rules to a lawyer who engaged in in-person solicitation of accident victims (see *id*. at pp. 464-468), "*Ohralik* in no way relieves the State of the obligation to demonstrate that it is regulating [commercial] speech in order to address what is in fact a serious problem and that the preventative measure it proposes will contribute in a material way to solving that problem. [Citation.]" (*Edenfield*, *supra*, 507 U.S. at p. 776.) "It is well established that '[t]he party seeking to uphold a restriction on commercial speech carries the burden of justifying it.' [Citations.] This burden is not satisfied by mere speculation or conjecture; rather, a governmental body seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree. [Citations.]" (*Id*. at pp. 770-771; see *Greater New Orleans*, *supra*, 527 U.S. at p. 188.)

The high court has " 'permitted litigants to justify speech restrictions by reference to studies and anecdotes pertaining to different locales altogether, or even, in a case applying strict scrutiny, to justify restrictions based solely on history, consensus, and "simple common sense." ' [Citation.]" (*Lorillard*, *supra*, 533 U.S. at p. 555, quoting *Went For It, Inc.*, *supra*, 515 U.S. at p. 628.) However, in this case, the People have made no attempt to show that section 2076 *directly and materially* advances the state's substantial interests.[14] (Cf. *Edenfield*, *supra*, 507 U.S. at pp. 767, 770-771 [state board of

---

[14] Neither has the dissent made a concrete showing that section 2076 "advances [the government's] asserted interests in any *direct and material way*." (*Edenfield*, *supra*, 507 U.S. at p. 771, italics added.) In other words, the dissent has not demonstrated that "the restriction will *in fact* alleviate [real harms] to a material degree." (*Ibid.*, italics added.) The dissent does not point to any empirical data, history, or evidence, even anecdotal, to establish the efficacy of the regulation. Its unsupported reasoning sounds more like less-demanding "rational basis" review than the heightened scrutiny applicable to commercial speech. (Cf. *F.C.C. v. Beach Communications, Inc.* (1993) 508 U.S. 307, 315 [on "rational basis" review, "a legislative choice is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical

accountancy failed to demonstrate that ban on personal solicitation by certified public accountants as applied to a CPA's proposed solicitation advanced its substantial interests in a direct and material way].)

Although they articulate substantial state interests, the People merely make the conclusory statements that section 2076 advances those interests and is "narrowly tailored." But they utterly fail to tie section 2076 to the direct and material advancement of those interests. We assume that section 2076 might indirectly deter unlawful solicitation of arrestees, but an indirect effect is not enough to survive judicial scrutiny. We note that the information pertaining to arrests and criminal complaints and "the persons involved therein" (§ 2076) might also be useful in facilitating licensees' lawful

---

data. [Citations.]"].) The evidentiary burden is on the government to justify a regulatory restriction on commercial speech. (See *Edenfield*, *supra*, 507 U.S. at pp. 770-771; see also *Liquormart*, *supra*, 517 U.S. at p. 505 (plur. opn. of Stevens, J.) [state required to show that "the price advertising ban [on liquor] will *significantly* reduce alcohol consumption"; "without any findings of fact, or indeed any evidentiary support whatsoever, we cannot agree with the assertion that the price advertising ban will significantly advance the State's interest in promoting temperance"].)

    The dissent's reliance on two United States Supreme Court decisions is misplaced. In *Went For It*, *supra*, 515 U.S. 618, one of the cases cited, the United States Supreme Court scrutinized Florida Bar rules that "prohibit[ed] personal injury lawyers from sending targeted direct-mail solicitations to victims and their relatives for 30 days following an accident or disaster." (*Id*. at p. 620.) The court concluded that the state bar had demonstrated that the challenged restriction advanced the governmental interest in a direct and material way by submitting "a 106-page summary of its 2-year study of lawyer advertising and solicitation" (*id*. at p. 626), which "contain[ed] data—both statistical and anecdotal—supporting the Bar's contentions . . . ." (*Ibid*.) The court observed that "[t]he anecdotal record mustered by the Bar [was] noteworthy for its breadth and detail." (*Id*. at p. 627.) In *Tennessee Secondary School Athletic Ass'n v. Brentwood Academy*, *supra*, 551 U.S. 291, the other case cited, the Supreme Court considered whether an interscholastic athletic association's rule that barred coaches of member high schools from recruiting middle school athletes for their athletic programs violated the First Amendment. (*Id*. at p. 294.) The court did not apply *Central Hudson* analysis to the anti-recruiting rule, and it did not evaluate whether the rule directly and materially advanced a substantial state interest.

negotiations or solicitation of bail with permissible persons other than arrestees. (See §§ 2079, 2079.1, 2080.)

Since the state has failed to carry its burden, we conclude that section 2076 is invalid as a facially overbroad regulation of speech that does not survive even the intermediate level of review that applies to commercial speech. In light of our conclusion, it is unnecessary to resolve defendant's First Amendment overbreadth claim. Facial invalidation of the regulation requires the reversal of defendant's conviction.

## DISPOSITION

The judgment is reversed. Upon remand, the trial court shall permit defendant to withdraw her plea and dismiss the action.

_____
ELIA, J.

I CONCUR:


_____
PREMO, Acting P.J.


*People v. Martinez*
H046164


33

**Grover, J., Dissenting**

California Code of Regulations, title 10, section 2076 provides: "No bail licensee shall, for any purpose, directly or indirectly, enter into an arrangement of any kind or have any understanding with a law enforcement officer, newspaper employee, messenger service or any of its employees, a trusty in a jail, any other person incarcerated in a jail, or with any other persons, to inform or notify any licensee (except in direct answer to a question relating to the public records concerning a specific person named by the licensees in the request for information), directly or indirectly, of: [¶] (a) The existence of a criminal complaint; [¶] (b) The fact of an arrest; or [¶] (c) The fact that an arrest of any person is impending or contemplated. [¶] (d) Any information pertaining to the matters set forth in (a) to (c) hereof or the persons involved therein." (Unspecified section references are to this regulation.)

I agree with the majority that the regulation is not unconstitutionally vague on its face. But I respectfully disagree with the conclusion that respondent has failed to satisfy the test in *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of N. Y.* (1980) 447 U.S. 557 (*Central Hudson*) to determine whether government regulation of commercial speech unconstitutionally infringes on First Amendment rights. Applying *Central Hudson* here, I would find that the challenged regulation directly advances at least one substantial state interest and is not excessively restrictive. I would also find that the regulation is not facially overbroad, and conclude that it survives constitutional scrutiny.

1

Commercial speech is broadly described as "expression related solely to the economic interests of the speaker and its audience." (*Central Hudso n*, *supra*, 447 U.S. at p. 561.) Defendant argues that the regulation prohibits certain agreements regardless of any commercial purpose and is therefore subject to strict scrutiny of its effects on noncommercial speech, rather than *Central Hudson's* intermediate scrutiny of effects on commercial speech. Section 2076 restricts bail agents from entering arrangements to obtain information regarding criminal complaints and arrests from persons with ready access to that information. A bail agent may not enter into agreements to receive such information "for any purpose." (10 Cal. Code Regs, § 2076.) I view the phrase "for any purpose" as preventing a bail licensee from circumventing the regulation by assigning an ostensibly neutral purpose to a prohibited arrangement or understanding. But the phrase does not expand the restriction to encompass noncommercial speech, as it still pertains only to bail agents and reaches only information identifying potential clients to the bail licensee. As the majority notes, section 2076 does not impact the free speech rights of non-licensees because it does not penalize a non-licensee from conveying any information specified in section 2076. Because its reach is limited to commercial speech, I conclude the regulation's impacts are subject to First Amendment analysis under *Central Hudson*.

*Central Hudson* sets forth a multi-part test for determining whether restrictions on commercial speech that is neither misleading nor related to an unlawful activity infringe on First Amendment rights: (1) the government must assert a substantial interest to be achieved by the restriction; (2) the restriction must directly advance the state interest

involved; and (3) the restriction must not be excessive. (*Central Hudson*, *supra*, 447 U.S. at p. 564.) The second and third criteria assure that any limitation on expression is designed carefully to achieve the stated goal. (*Ibid*.)

Respondent argues California has a substantial interest in regulating bail agents, including maintaining standards of ethical conduct. The court in *People v. Dolezal* (2013) 221 Cal.App.4th 167 recognized California's substantial interest in regulating the work of bail agents, who are "licensed professionals" and "an integral part of the criminal justice system." (*Id*. at p. 174.) Indeed, "[t]he state has an interest in regulating their work to make sure that they operate in a fair, honest and professional manner." (*Ibid*.; see *Florida Bar v. Went For It, Inc*. (1995) 515 U.S. 618, 625 [recognizing a state's compelling interest in licensing and regulating the practice of professions]; *Edenfield v. Fane* (1993) 507 U.S. 761, 770 [acknowledging "the State's important interests in maintaining standards of ethical conduct in the licensed professions"].) Respondent also identifies the state's interest in ensuring the orderly administration of justice and in protecting recent arrestees from harassment, intimidation, annoyance, and invasion of privacy from bail agents or others acting on their behalf. Those interests have been recognized as substantial in the context of First Amendment challenges to commercial speech regulations. (*Dolezal*, at p. 174.) The substantial government interests identified by respondent thus satisfy the first prong of *Central Hudson*.

Respondent argues that by "prevent[ing] bail agents from obtaining arrest information from third parties inside the criminal justice system or who have ready access to arrestees," the regulation "prevents bond agents who have these insider

3

arrangements from gaining an unfair competitive advantage over licensees who are not engaged in this type of practice." I believe respondent's arguments adequately establish that section 2076 directly advances the state's interest in maintaining professional and ethical standards. (*People v. Dolezal*, *supra*, 221 Cal.App.4th at pp. 177–178 [upholding direct solicitation restriction under *Central Hudson* without evidentiary record of harm]; see also *Tenn. Secondary Sch. Athletic Ass'n v. Brentwood Acad.* (2007) 551 U.S. 291, 300 [empirical data not necessary to credit "commonsense conclusion" that speech regulation will serve governmental interest]; *Florida Bar v. Went For It, Inc.*, *supra*, 515 U.S. at p. 628 [speech restrictions may be justified "based solely on history, consensus, and 'simple common sense' "].) The regulation prohibits arrangements which facilitate the wholesale identification of people with imminent bail needs. By restricting bail licensees' access to that insider information, the regulation directly prevents unfair competition among licensed bail agents. Restricting licensees' access to wholesale identifying information also directly advances the state's interest in protecting arrestees from intrusive conduct. Further, the regulation is not unduly restrictive in light of the state's interests, as it does not prohibit agreements to obtain public records regarding persons already known to and identified by a bail agent.

I acknowledge that whether the regulation directly advances the orderly administration of justice is less clear than its advancement of the state's other identified interests. But advancing the orderly administration of justice is not necessary here because, in my view, the other government interests satisfy all prongs of the *Central Hudson* test.

4

I would also reach and reject defendant's overbreadth challenge. A statute is facially overbroad if it "may cause others not before the court to refrain from constitutionally protected speech." (*Broadrick v. Oklahoma* (1973) 413 U.S. 601, 612; accord *People v. Stanistreet* (2002) 29 Cal.4th 497, 511.) [" '[A] constitutional challenge based on asserted overbreadth … must demonstrate the statute inhibits a substantial amount of protected speech.' (*New York v. Ferber* (1982) 458 U.S. 747, 768–769.)"]. Section 2076 prohibits bail agents from arranging to receive certain information identifying persons with an immediate or imminent need to post bond. Section 2076 does not impact the free speech rights of non-licensees, nor does it restrict anyone from speaking to the fact of a criminal complaint, or a present, contemplated, or impending arrest. In no way does it restrain a bail agent's lawful communications with an arrestee, incarcerated or otherwise. The prohibited transactions therefore do not impose a substantial restriction on constitutionally protected speech.

Seeing no constitutional impediment to enforcing California Code of Regulations, title 10, section 2076, I would affirm defendant's conviction under Insurance Code section 1814.

_____
GROVER, J.

5

| | |
|---|---|
| Trial Court: | Santa Clara County<br>Superior Court No.:  C1518585 |
| Trial Judge: | Honorable Socrates Peter Manoukian |
| Counsel for Plaintiff and Respondent<br>THE PEOPLE | Xavier Becerra<br>Attorney General<br><br>Lance E. Winters,<br>Chief Assistant Attorney General<br><br>Jeffrey M. Laurence,<br>Senior Assistant Attorney General<br><br>Rene A. Chacon,<br>Supervising Deputy Attorney General<br><br>Julia Y. Je,<br>Deputy Attorney General |
| Counsel for Defendant and Appellant<br>MONICA MARIE MARTINEZ | Lori A. Quick |

*People v. Martinez*
H046164